UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>TYRONE DAVIS<br><br>Defendant. | Case No. 2:12-cr-00289-JCM-PAL<br><br>**REPORT OF FINDINGS AND RECOMMENDATION**<br><br>(Mot. Suppress – Dkt. #144) |

Before the court is Defendant Tyrone Davis' ("Davis") Motion to Suppress Illegally Obtained Evidence Pursuant to *Franks v. Delaware* (Dkt. #144) which was referred for a Report of Findings of Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB1-4.  The court has considered the Motion (Dkt. #144), the government's Omnibus Response (Dkt. #154), and Davis' Reply (Dkt. #166).  Davis filed a Supplement to Motion to Suppress (Dkt. #169) with voluminous attached exhibits October 19, 2015, the United States filed a Response to the Supplement (Dkt. #171) on November 4, 2015, and Davis filed a Reply to the Supplement (Dkt. #172) November 9, 2015.  A hearing was scheduled for November 24, 2015 and continued twice pursuant to stipulation. An evidentiary hearing was finally held December 21, 2015, on Davis' Motion to Suppress Statements, and the court heard oral arguments on this motion to suppress. After hearing arguments of counsel, the court allowed counsel for Defendant to question two of the officers involved in the investigation, on the Davis' *Franks* arguments.

## BACKGROUND

Davis is charged in an Indictment (Dkt. #1) returned August 7, 2012, with possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); possession of cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D); and

possession of a firearm in relation to a drug trafficking offense in violation of 18 U.S.C. §§ 922(g)(1) and 924(c).

Davis was arrested July 19, 2012, by Las Vegas Metropolitan Police Department ("LVMPD") robbery detectives for a robbery that occurred on June 27, 2012. Four women reported that Davis had approached them and engaged them in conversation. At some point, the women became uncomfortable and started to leave. The women reported that Davis approached one of the women from behind, grabbed her purse and fled. Detectives learned where Davis might be living and arrested him outside of his apartment complex at 6500 Vegas Drive in Las Vegas, Nevada. At the time of his arrest, LVMPD detectives obtained a telephonic search warrant to search his residence for evidence of the robbery.

While executing the first search warrant, the officers found: (1) a Browning .22 caliber automatic pistol; (2) a bulletproof vest; (3) thirteen rounds of .357 caliber ammunition; (4) forty-three rounds of .25 caliber ammunition; (5) thirty-three rounds of .22 caliber ammunition; (6) a pistol magazine; (7) five baggies of a white powdery substance which field tested positive for 9.6 grams of cocaine; (8) 7.9 grams of marijuana; and (9) digital scales and baggies. A second state telephonic search warrant was applied for by another detective later that same evening to search a blue 1995 Oldsmobile located at the apartment complex. The second search warrant requested and received judicial authorization to search for and seize a Browning .22 caliber handgun, any other firearms, firearm paraphernalia, magazines, ammunition, cleaning kits and holsters, narcotics and narcotics paraphernalia, and a bulletproof resistant vest.

This is not the first motion to suppress physical evidence filed in this case. Davis' prior counsel filed a Motion to Suppress (Dkt. #31) March 18, 2013. He argued that the first search warrant lacked probable cause to believe that the fruits of the robbery would be found in the residence three weeks after the robbery. He also argued the search warrant application failed to establish probable cause to support a search for paperwork such as rent receipts, utility bills and letters showing the name of the person residing in the premises. Because the victim and witnesses knew Davis and identified him by name and photo lineup, counsel also argued that the police did not need the clothing the robber was wearing on the day of the robbery to establish

2

their case as the victim and three other witnesses knew him by name and identified him in a photo lineup.  He argued that the search warrant was obtained so the police could conduct an exploratory search of the residence, that the warrant was so lacking in probable cause and so overbroad that the officers could not have reasonably relied on it in good faith.  The first motion to suppress also sought a *Franks* hearing asserting that Detective Bruno's application for the search warrant contained material misrepresentations that, in his experience, "examination of the crime scene" and recovering property requested in the warrant was necessary to provide evidence of the crime.

The government opposed the motion and the court entered a Report of Findings and Recommendation (Dkt. #33) April 23, 2013, recommending denial of the motion to suppress. No objections were filed and on May 21, 2013, the district judge entered an order (Dkt. #35) adopting the report and recommendation in its entirety.

**I.      The Motion to Suppress (Dkt. #144)**

In the current motion to suppress, Davis argues that evidence recovered from Davis' apartment on July 19, 2012, should be suppressed because the officers who applied for both telephonic search warrants misrepresented and/or omitted material information.  Davis claims that false and misleading statements were made knowingly and intentionally or with reckless disregard for the truth, and that the detectives could not establish the place to be searched without materially misrepresenting information in their applications.

Specifically, Davis claims that Detective Bruno, who applied for the first telephonic search warrant, misrepresented when officers learned about Davis' address.  Second, Detective Bruno's application indicates that officers confirmed the address by observing Davis physically enter his apartment on July 19, 2012.  However, Detective Bruno's arrest report indicates that Davis was observed driving into the parking lot of the complex and was stopped before he entered his apartment.  Third, Detective Bruno represented to the issuing judge that officers at the scene conducted a "knock-and-talk" with negative contact.  However, the knock-and-talk is not mentioned in any subsequent reports.  Fourth, Detective Bruno represented to Judge Tobiasson that officers arrested Davis when he emerged from the apartment which is contrary to

his report that reflects that police stopped Davis in the parking lot before he entered his apartment.  Finally, Detective Bruno's report indicates that from July 14, 2012, to July 18, 2012, officers had several conversations with a "concerned citizen" to confirm Davis' address.  The report belies Detective Bruno's representation to Judge Tobiasson that he did not learn of Davis' current address until July 19, 2012.  No information is provided about the unnamed civilian.  The search warrant application omitted any reference to a confidential informant.

A "duplicate original" search warrant is attached as Exhibit B.  It indicates that probable cause for the search warrant was based upon the statement of a Sergeant Melton.  Sergeant Melton is not mentioned in any of the discovery provided by the government.  Davis believes that someone altered the duplicate original search warrant "to reflect Detective Bruno's representations to Judge Tobiasson made through his Application."   The duplicate original indicates that officers had continuous visual surveillance on the scene, but was amended to indicate "officers later arrested Davis when he emerged from his apartment."  This shows Detective Bruno recklessly omitted material information that would have been crucial to the finding of probable cause.  Davis also maintains that Detective Bruno clearly misled Judge Tobiasson to believe he had obtained and confirmed Davis' address through a certain method of investigation by failing to disclose crucial information.

The second telephonic search warrant was obtained by Detective Price.  Detective Price related to Judge Tobiasson what officers had recovered from the initial search and stated that officers froze the apartment and left the handgun, ammunition and drugs in the place to obtain a second search warrant because the first warrant did not request permission to seize them.  The property report prepared by Detective Sazer indicates that all of the items seized from the apartment were recovered at or around 18:50 hours, an hour and twenty minutes before Detective Price even called to obtain the second search warrant.  Additionally, a crime scene investigation report was prepared at 19:15 hours which indicates that officers took digital images of the scene and conducted latent testing on the firearm.  These two reports show that Detective Price misrepresented to Judge Tobiasson that the scene had been frozen as the reports clearly indicate that the property was recovered and the crime scene processed before the warrant was obtained.

4

1    Finally, Detective Price deliberately misrepresented that Davis' apartment had been frozen and

2    evidence had already been recovered and the scene was being processed.   Davis seeks an

3    evidentiary hearing to challenge the truthfulness of the statements contained in the affidavits.

4    **II.     The Government's Omnibus Response (Dkt. #154)**

5         The government opposes the motion that Davis has not met his threshold burden of

6    showing that the affidavits contained intentionally or recklessly false statements or misleading

7    omissions, and that the affidavits do not support a finding of probable cause without the

8    allegedly false or misleading information or omissions.   Suppression is only warranted if the

9    affidavits contain deliberate or reckless omissions.   The government acknowledges that

10   deliberate intent to deceive or reckless disregard for the truth may be inferred from the omission

11   of material facts that would have negated probable cause.   However, negligent or good-faith

12   mistakes are insufficient.   Citing *United States v. Perdomo*, 800 F.2d 916, 920 (9th Cir. 1986),

13   the government argues that a *Franks* hearing must be based on more than conclusory and

14   unsupported allegations and a mere desire to cross-examine the officer.

15        The government maintains that Detective Bruno did not make any misrepresentations.

16   Detective Bruno was not present when officers apprehended Davis on July 19, 2012.   Detective

17   Bruno relied on information from other officers about when and where Davis was arrested.

18   Detective Bruno did not provide information to Judge Tobiasson about the concerned citizen

19   who was an individual who claimed to work on Davis' car who confirmed where Davis lived.

20   However, the motion to suppress does not explain why this would have made a difference in

21   reaching a probable cause determination.   Detective Bruno had a good-faith belief that Davis

22   lived at the apartment for which the search warrant was requested.

23        The government asserts that Davis confuses the duplicate original search warrant with the

24   telephonic search warrant declaration and search warrant return.   The telephonic search warrant

25   declaration attached as an exhibit to the warrant is a template the officer used to obtain a

26   telephonic search warrant.   The most reliable information about what was actually told to the

27   issuing judge on July 19, 2012, is the transcript of the conversation which is attached as Exhibit

28   B to the government's opposition.

The government also argues that Davis incorrectly concludes that Detective Price lied to the issuing judge based on the property reports and crime scene investigation reports prepared by other officers.  The first search warrant was issued at 17:11 hours.  The time hand-written on the top of the property report is 18:50 hours, and the time typed at the top of the crime scene report is 19:15 hours which is consistent with both officers arriving at the scene, not necessarily with the time the evidence was collected or processed.  The government argues that LVMPD was not required to obtain the second search warrant because the items were found in plain view pursuant to the initial search warrant.  At the time of the first search, officers knew Davis resided at the location and was a prohibited person who could not possess firearms, ammunition or bulletproof vests.  Thus, these items could have been seized based on the plain view exception to the warrant requirement.

### III.    Davis' Reply (Dkt. #166)

Davis replies that the misrepresentations made concerning how and when officers obtained Davis' address made a difference to Judge Tobiasson's finding of probable cause.  First, it is significant that after several failed attempts to obtain Davis' address, Officer Owens "miraculously located a current address for Davis."  Detective Bruno offered no explanation as to how Owens located Davis' address after three failed attempts.  Detective Bruno must have believed he needed to provide the judge with a stronger basis for believing Davis lived in the searched premises and therefore told the judge that officers had physically observed Davis enter the apartment which was false.  The officers actually stopped Davis in the parking lot before he entered the apartment.  Had this been disclosed, it would have diminished the judge's belief that Davis resided in or had a connection to the apartment.  Detective Bruno also falsely represented that the officers attempted a knock-and-talk while Davis was inside the residence to reinforce the likelihood that Davis resided there.  These false statements bolstered probable cause and without them, the warrant lacked probable cause.

Detective Bruno failed to disclose that he relied on information provided by an informant to establish where Davis lived to provide probable cause for the place to be searched.  When relying on information obtained from an informant, a law enforcement officer must tell the judge

1    about the existence of the informant and why the agent believes the informant is reliable.

2    Detective Bruno provided the judge with no information at all concerning information officers

3    had from the informant concerning where Davis lived.  Detective Bruno's report indicates that

4    police confirmed the address provided by Owens through a "concerned citizen" who pointed out

5    the apartment where Davis resided.  This clearly implies that police were unsure that Owens had

6    successfully located Davis' address.  Had Judge Tobiasson been told this, she would have been

7    uncertain whether Davis actually lived at the fourth address provided by Owens.  Additionally,

8    because the concerned citizen's information "would only have helped strengthen the probable

9    cause determination" it made no sense for Detective Bruno to withhold that information from

10   Judge Tobiasson.

11          Davis argues that the government's arguments in the reply concerning the timing of the

12   crime scene analysts' report and property report are speculative.  The government does not

13   represent that counsel has spoken to the authors to determine why their reports indicate they

14   were processing evidence in an apartment that was supposedly frozen.  Finally, Davis argues that

15   the government cannot meet the plain view test because the initial intrusion into the apartment

16   was unlawful due to the material omissions made to obtain the first and second warrants.  The

17   government's failure to address a number of his arguments warrants an evidentiary hearing.

18   **IV.     Davis' Supplement to Motion to Suppress (Dkt. #169)**

19          Without leave of court, or explanation for why a supplement was necessary, counsel for

20   Davis filed a supplement October 19, 2015, which generated a response and reply.  The

21   supplement asserts the court should suppress evidence obtained on July 19, 2012, because law

22   enforcement officers searched Davis' residence prior to obtaining a search warrant.  These

23   arguments are based on metadata from two digital cameras which photographed Davis'

24   apartment on the day of the search.  Copies of the photographs with the date and time image are

25   attached as exhibits to the supplement.  Davis argues that, based on the date and time stamp, 43

26   photographs inside of his residence were taken before the first search warrant application.

27   Detective Bruno applied for the first search warrant at 17:11 hours or 5:11 p.m.  Metadata for the

28   80 photographs inside of Davis' residence on July 19, 2012, show that pictures were taken

1    between 4:41 p.m. P.D.T., and 8:01 p.m. P.D.T., although the first search warrant was not

2    applied for until 5:11 p.m.

3            The second search warrant was applied for at 20:18 or 8:18 p.m.  Detective Price's

4    application represented to Judge Tobiasson that the premises were frozen.  However, the date

5    and time on the photographs shows this representation was false.  Additionally, Detective

6    Sazer's property report indicates that the firearms and ammunition had been recovered after

7    service of the search warrant.  However, the property report contains the time 18:50 or 6:50 p.m.

8    This indicates that law enforcement officers had been inside the residence and had been

9    processing evidence nearly an hour-and-a-half before Detective Price applied for the second

10   search warrant.  The metadata on the photographs also indicates that CSA Smith was inside

11   Davis' residence processing the scene for latent prints while the premises was supposedly frozen.

12   The time on the report is 19:15 or 7:15 p.m.  Additionally, the metadata show that law

13   enforcement agents began photographing the interior and exterior of Davis' vehicle at 7:34:29

14   p.m. which contradicts Detective Price's statement to Judge Tobiasson that officers were seeking

15   a warrant to search Davis' vehicle.  In reality, the application was an attempt to cure the Fourth

16   Amendment violation that occurred when law enforcement agents conducted a warrantless

17   search of Davis' residence and vehicle.

18   **V.    Government's Response to Supplement (Dkt. #171)**

19           In a footnote, the government responds that the supplement was filed after the motion

20   deadlines expired, and that Davis had the photographs in this case at the time he filed his initial

21   motion to suppress in 2013.  Addressing the arguments concerning metadata, the government

22   represents that two cameras were used to take photographs in this case.  A Panasonic camera was

23   used by Detective Sazer.   A Canon camera was used by CSA Jeff Smith.  The photos taken by

24   CSA Smith's Canon camera began at 7:19 p.m., consistent with his reported time of arrival.  The

25   government represents that the time stamp on CSA Smith's Canon camera is correct.  However,

26   the Panasonic camera used by Detective Sazer had not been adjusted for daylight savings which

27   occurred in March 2012.  As a result, Detective Sazer's Panasonic camera is one hour behind the

28   actual time that the photographs were taken.  The actual time Detective Sazer took his first

1    photograph is 5:42 p.m., after the initial telephonic search warrant was obtained by Detective

2    Bruno at 5:21 p.m.

3          The government also represents that the time recorded on Detective Sazer's property

4    report is 6:50 p.m., but the report does not have a start and end time.  In this case, multiple

5    officers searched the apartment and different officers located different items.  The government

6    asserts that the person filling out the report is not necessarily the person who first locates the

7    item during the search, and that many officers fill out the top of a report when the search begins

8    while others fill it out later at the precinct.  The response to supplement reiterates arguments

9    made in opposition to the motion that a *Franks* hearing is not warranted and that the guns and

10   drugs seized in this case were found in plain view during execution of the first search warrant.

11   Therefore, a second search warrant was not required.

12   **VI.    Davis' Reply to Government's Response to Supplement (Dkt. #172)**

13         The reply argues the court should grant an evidentiary hearing because there are

14   contested issues of fact that have been alleged with sufficient definiteness, clarity and specificity

15   to warrant one.  The government's response to this supplement "underscores the contention that

16   numerous issues of contested facts exist" which require this court to resolve the important

17   constitutional issues presented in this series of motions.

18   **VII.   Testimony at the Evidentiary Hearing**

19         Detective Bruno testified at the evidentiary hearing concerning Davis' motion to suppress

20   statements he gave on the date of his arrest and the following day.  Detective Bruno explained

21   that he had information from other officers that Davis lived at 6500 Vegas Drive and that after

22   obtaining this information, officers conducted surveillance to confirm Davis resided at the

23   apartment.  Detective Bruno testified that Detective John Owens gave him the information about

24   Davis' address.  Detective Bruno also testified that Davis was arrested in the parking lot of the

25   apartment complex, not while emerging from the apartment.

26         After hearing oral argument on Defendant's request for a *Franks* hearing, the court

27   allowed defense counsel to call Detective Sazer, the officer using the camera which had metadata

28   suggesting that photographs of Davis' apartment were taken before the first search warrant was

9

1   obtained.  The court also allowed defense counsel to call Detective Owens, the officer providing

2   Detective Bruno with information that Davis resided at the apartment at 6500 Vegas Drive.

3          **A.  Testimony of Detective Sazer**

4          Detective Sazer testified that on July 19, 2012, he did not recall having any contact with

5   Davis.  He could not recall if he had keys to the apartment before he entered.  He did not recall

6   the time he initiated his investigation.  He did not recall what camera he used to take photographs

7   of the searched premises.  His recollection was refreshed by a police report.  Detective Sazer

8   testified that the camera he used was a point-and-shoot camera that was issued to him by the

9   Gang Unit.  He did not recall when he first got it.  The equipment he has used over the years has

10  changed.  When he first started with the department, he used a Polaroid.

11         The camera he used to document the search of Davis' apartment was an auto-focus which

12  did not require adjustments.  It was not just assigned to him, but to the bureau.  It was used by

13  others.  He did not look at the time on the camera or notice that it was off.  The camera does

14  everything for you.  The only functions he would check was whether the batteries were providing

15  an adequate charge, and the zoom and macro feature.  When the camera takes a picture, it

16  captures the image on the screen for a few seconds.  He looks at the camera to check the

17  photograph, but does not look at the time stamp.

18         On cross-examination, Detective Sazer testified that he did not enter Davis' apartment

19  before the search warrant was obtained.  He did not see anyone else enter the apartment before

20  the warrant was obtained.  He did not know offhand how to adjust the time stamp on the camera

21  he used.  He initially did not recall if there was another crime scene analyst on scene.  When his

22  recollection was refreshed, he recalled that CSI Smith was present and used another camera.

23         In response to questions by the court, Detective Sazer testified that he is positive he did

24  not enter Davis' apartment before the search warrant was obtained.  He only learned that there

25  was a problem with the time stamp on the camera in connection with the motion to suppress

26  brought in this case.  He did not know if anyone had checked the camera to determine how the

27  error had occurred.  He could not explain why the time on the camera indicated he entered the

28  apartment before the search warrant was obtained.  However, he was adamant that he did not,

and would not, enter any apartment to photograph a searched premises until after being notified the search warrant was obtained.

### B. Testimony of Detective Owens

Detective Owens testified that on July 14, 2012, he was able to locate an address for Davis.  He used several law enforcement computer tools, but could not recall the specific computer system he used to locate an address for Davis.  He also did a criminal records check because he was assisting other officers in the investigation.  He did follow up trying to locate Davis and went out to take a look at the apartment complex several times.

At the apartment complex on Vegas Drive, he came into contact with a black male adult who was driving a vehicle he knew from police records was associated with Davis.  Owens initially thought the driver of the vehicle might be Davis.  However, as he got closer to the vehicle, it was clear the individual was not Davis.  He did not recall the name of the individual. He did not take the individual's name or record his address.  He did, however, have a conversation with this person.  The man said he was Davis' mechanic and was working on Davis' vehicle.  The man also told Detective Owens that Davis was out of town and verified which apartment Davis lived in by pointing to it, without providing an apartment number. Detective Owens could not recall if he contacted the property manager to confirm that Davis leased the apartment.

Detective Owens testified that he went to the apartment on July 18, or possibly the day of contact with Davis.  He recalled that he went out to the apartment several times looking for Davis before his arrest.

On cross-examination, Detective Owens testified that he went to the apartment complex and saw Davis sometime between July 14, and July 18, 2012.  Surveilling officers saw Davis pull up and enter the apartment.  The officers went to the door to do a knock-and-talk, but Davis did not answer the door.

On redirect examination, Detective Owens testified that he believed the knock-and-talk occurred sometime between July 14 and July 18, 2012, but that it was possible it could have been the day Davis was arrested, July 19, 2012.

11

1

**DISCUSSION**

2

**I.      Applicable Law**

3          A defendant is entitled to a hearing pursuant to the United States Supreme Court's

4   opinion in *Franks v. Delaware* where he makes a substantial preliminary showing that: (a) the

5   affidavit in support of a search warrant contains intentionally or recklessly false statements or

6   misleading omissions; and (b) the affidavit in support of a search warrant cannot support a

7   finding of probable cause without the allegedly false information.  *See Franks,* 438 U.S. 154, 170

8   (1978)); *United States v. Reeves,* 210 F.3d 1041, 1044 (9th Cir. 2000).  To justify a hearing, a

9   defendant must make "specific allegations, allege a deliberate falsehood or reckless disregard for

10   the truth, and accompany such claim with a detailed offer of proof."  *United States v. Craighead,*

11   539 F.3d 1073, 1080 (9th Cir. 2008) (citation omitted).  Intentional or reckless omissions may

12   also provide grounds for a *Franks* hearing.  *See United States v. Jawara,* 474 F.3d 565, 582 (9th

13   Cir. 2007).  If a defendant makes the requisite preliminary showing, the court conducts a hearing

14   to determine the validity of the warrant.  Suppression results if, after excising the false or

15   misleading statements from the affidavit, there is not probable cause to support the warrant.  *See*

16   *Franks,* 438 U.S. at 171-72.

17          During oral argument at the hearing on December 21, 2015, counsel for Davis argued that

18   the court should conduct a *Franks* hearing on the first search warrant because of statements made

19   by Detective Bruno in the application regarding the place to be searched, and information he had

20   concerning Davis' address prior to July 19, 2012.  Detective Bruno testified during the motion to

21   suppress statements that Davis was actually arrested in the parking lot and not emerging from his

22   apartment as the application stated.  The court allowed defense counsel to call Detective Owens,

23   the officer providing Detective Bruno with the information concerning Davis' address.

24          With respect to the second search warrant, defense counsel argued that an evidentiary

25   hearing should be permitted concerning the discrepancy between the metadata on Detective

26   Sazer's camera and the time the second search warrant was obtained.  Defense counsel

27   represented that he had since reviewed the instruction manual for the camera Detective Sazer

28   used and that he believed it would have been evident if there was an error about the time stamp

1  on the camera.  Counsel for Davis represented it would have been an easy thing for the detective

2  to correct, and that the mistake should have been evident.  The court therefore allowed defense

3  counsel to call Detective Sazer.

4  **II.     Analysis and Decision**

5          Davis argues there were materially false and misleading errors and omissions made in the

6  first search warrant application which mandate a *Franks* hearing and suppression.  First, he

7  argues the search warrant application was wrong about when officers learned about Davis'

8  address.  Second, the search warrant falsely claimed that Davis was observed physically entering

9  the apartment on Vegas Drive.  Third, the affidavit was false that officers did a knock-and-talk at

10  the apartment with negative results.  Fourth, the affidavit falsely claimed that Davis was arrested

11  emerging from his apartment.  Fifth and finally, the affidavit contained material omissions by

12  failing to advise the issuing judge that investigating officers had conversations with an informant

13  or a concerned citizen between July 14 and July 18, 2012.

14          The first search warrant application authored by Detective Bruno was wrong in stating

15  that Davis was arrested coming out of his apartment.  Detective Bruno himself testified that

16  Davis was arrested in the parking lot.  However, the court finds Davis' remaining claims are

17  without merit.  It is clear from the testimony of Detective Owens that a number of investigating

18  officers were involved in attempting to verify Davis' address.  Detective Owens testified that he

19  got an address for Davis on July 14, 2012, using one of the police computer database systems.

20  He also testified that officers conducted surveillance at the apartment complex on Vegas Drive

21  between July 14, and July 18, 2012.  He testified that he was out at the apartment complex

22  several times.  On one occasion while at the apartment complex, Detective Owens had contact

23  with a black male adult driving one of the vehicles police knew from a police records check was

24  associated with Davis.  The individual claimed to be Davis' mechanic and told Detective Owens

25  that Davis was out of town.

26          Detective Owens also testified that Davis was observed by surveillance officers entering

27  his apartment.  The surveilling officers did a knock-and-talk, but Davis did not answer the door.

28  / / /

13

1    Detective Owens was not sure what date the knock-and-talk occurred, but thought it was either

2    July 18, or July 19, 2012.  The court found Detective Owens credible in his testimony.

3         Detective Bruno's search warrant application did not inform Judge Tobiasson about the

4    black male adult who provided additional information connecting Davis to the searched

5    premises.   However, this additional information would have bolstered, not negated probable

6    cause to believe that Davis lived in the apartment.  The failure to inform Judge Tobiasson of this

7    additional information does not invalidate the warrant.

8         Davis' arguments about the duplicate original were not mentioned in oral argument.  It is

9    clear from a review of the exhibits attached to the government's response that the duplicate

10   original was a template or form used to prepare the telephonic search warrant application for

11   Davis' apartment.  The transcript of the telephonic search warrant was attached as an exhibit to

12   the government's response and produced in discovery.   The transcript of the telephonic

13   application for the search warrant with Judge Tobiasson is the best evidence of the

14   representations made to Judge Tobiasson which resulted in the issuance of the warrant.

15        Detective Sazer was unable to explain why the metadata on the camera he used to

16   photograph Davis' apartment during the search warrant reflect that photographs were taken

17   before the first search warrant was obtained.  He only learned there was a problem with the time

18   stamp on the camera as a result of this motion to suppress.  Detective Sazer also testified that he

19   did not check the time stamp on the camera he used to photograph Davis' apartment.  He

20   testified that the only functions he checked on the camera were the zoom and macro features, and

21   that the camera was a point-and-shoot which did all the work for him.  Detective Sazer was

22   adamant that he did not, and would not, enter an apartment to photograph before a search warrant

23   was obtained.  The court found him credible that he did not look at the time stamp on the camera

24   and that the camera only captures the picture on the screen for a few seconds.  In short, the court

25   found Detective Sazer credible that he did not enter the apartment to photograph the premises

26   until after the search warrant was obtained.

27        The court need not address Davis' remaining arguments about alleged errors or omissions

28   in the second search warrant.  It is undisputed that at the time the officers were executing the first

14

search warrant they were aware that Davis was a convicted felon.  The firearm, ammunition, vest and drugs are all contraband that were found in plain view.  Although the first warrant did not authorize seizure of a firearm, ammunition, vest and drugs, the plain view exception to the warrant requirement allows contraband to be seized.  *Horton v. California*, 496 U.S. 128, 136-37 (1980) (overruling *Coolidge v. New Hampshire*, 403 U.S. 443 (1971), to the extent *Coolidge* required inadvertent discovery.  The plain view exception to the warrant applies when property seized was observed from a vantage point where the viewing officer had the lawful right to be, and the evidentiary value of the item was immediately apparent.  *Id.*  Here, the initial intrusion into Davis' apartment was lawful pursuant to the first search warrant, and the incriminatory nature of the evidence was immediately apparent.

During oral argument, counsel for Davis relied on a sheet of four photographs taken during the execution of the search warrant that was marked and admitted as Defendant's Exhibit A.  The two photographs on the right-hand side of the page show a number of items in a drawer including a small black pouch with a pull string.  The top right-hand photograph shows that the small black pouch was opened and a white powdery substance was observed inside.  Counsel for Davis argued that anyone picking up that black pouch would have realized from the feel of the pouch that items authorized by the first search warrant would not have been located inside.  However, the first search warrant authorized a search for and seizure of earrings taken from the victim of the robbery.  The court finds that the officers conducting the search appropriately opened the black pouch to see if it contained items authorized by the first search warrant.  The plain view exception to the warrant applies with respect to the items of contraband found during execution of the first search warrant.

The court need not address the Defendant's remaining arguments about the second search warrant as it was an exercise in redundancy.  The second search warrant was obtained in an abundance of caution, but not required, under the Fourth Amendment.

/ / /

/ / /

/ / /

For these reasons,

**IT IS RECOMMENDED** that Davis' Motion to Suppress (Dkt. #144) be **DENIED.**

DATED this 29th day of December, 2015.

PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE