UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| UNITED STATES OF AMERICA, | Case No. 2:12-cr-00289-JCM-PAL |
|---|---|
| Plaintiff, | **REPORT OF FINDINGS AND RECOMMENDATION** |
| v. | |
| TYRONE DAVIS | (Mot. Suppress – Dkt. #147) |
| Defendant. | |

Before the court is Defendant Tyrone Davis' ("Davis") Motion to Suppress Statements (Dkt. #147) which was referred to me for a Report of Findings of Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB1-4.  The court has considered the Motion (Dkt. #147, the government's Omnibus Response (Dkt. #154), Davis' Reply (Dkt. #165), and testimony taken at an evidentiary hearing conducted December 21, 2015.

## **BACKGROUND**

Davis is charged in an Indictment (Dkt. #1) returned August 7, 2012, with possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); possession of cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D); and possession of a firearm in relation to a drug trafficking offense in violation of 18 U.S.C. §§ 922(g)(1) and 924(c).

Davis was arrested July 19, 2012, by Las Vegas Metropolitan Police Department ("LVMPD") robbery detectives for a robbery that occurred on June 27, 2012.  Four women reported that Davis had approached them and engaged them in conversation.  At some point, the women became uncomfortable and started to leave.  The women reported that Davis approached one of the women from behind, grabbed her purse and fled.  Detectives learned where Davis might be living and arrested him outside of his apartment complex at 6500 Vegas Drive in Las

Vegas, Nevada. At the time of his arrest, LVMPD detectives obtained a telephonic search warrant to search his residence for evidence of the robbery.

While executing the first search warrant, the officers found: (1) a Browning .22 caliber automatic pistol; (2) a bulletproof vest; (3) thirteen rounds of .357 caliber ammunition; (4) forty-three rounds of .25 caliber ammunition; (5) thirty-three rounds of .22 caliber ammunition; (6) a pistol magazine; (7) five baggies of a white powdery substance which field tested positive for 9.6 grams of cocaine; (8) 7.9 grams of marijuana; and (9) digital scales and baggies. A second state telephonic search warrant was applied for by another detective with the gang unit later that same evening to search a blue 1995 Oldsmobile located at the apartment complex. The second search warrant requested and received judicial authorization to search for and seize a Browning .22 caliber handgun, any other firearms, firearm paraphernalia, magazines, ammunition, cleaning kits and holsters, narcotics and narcotics paraphernalia, and a bulletproof resistant vest.

**I.    The Parties' Positions**

Davis has filed a separate motion to suppress physical evidence which requests a *Franks* hearing. In this motion, he seeks to suppress statements made on July 19, 2012, and July 20, 2012, following his arrest. He argues his statements on July 19, 2012, must be suppressed because he was subjected to custodial interrogation and had not been given *Miranda* warnings as required by the Fifth and Fourteenth Amendments. On July 19, 2012, Davis asserts he was in custody and subjected to custodial interrogation, confronted by numerous, armed police officers who executed a search warrant on his apartment, and transported to ISD headquarters by LVMPD Detective Robert Price to await transportation to the Clark County Detention Center ("CCDC"). The officer's report and arrest report do not indicate that Davis was told why he had been arrested. Davis was clearly in custody. Davis was told by LVMPD Detective Bruno that he had been arrested for robbing his former girlfriend which Detective Bruno knew, or should have known, would prompt Davis to explain his involvement in the alleged incident. As a result, Davis gave potentially incriminating statements which acknowledged possession of some illegal items found in his residence.

Additionally, Detective Bruno told Davis that there was a good chance this case would be "going a different direction than state court". Because Davis had already made potentially incriminating remarks, when Detective Bruno informed Davis about the federal aspect of the investigation, it is apparent he did so to keep the conversation going. All of these things applied subtle pressure on Davis that undermined his will to resist and compelled him to speak where he would not otherwise have done so freely. Thus, his July 19, 2012, statements should be suppressed.

On July 20, 2012, Davis was interrogated a second time. Although *Miranda* warnings were administered prior to his July 20, 2012 interrogation, Davis argues his incriminating statements must be suppressed because they were tainted by the prior un*Mirandized* interrogation on July 19, 2012. Davis also argues his pre-*Miranda* statement was involuntary. The post-*Miranda* statements were tainted by the earlier involuntary statements. Alternatively, Davis argues that even if his pre-*Miranda* statements on July 19, 2012, were voluntary, his July 20, 2012 statements were involuntary and should be suppressed under the totality of the circumstances including the time lapse between the two statements, the Defendant's lack of contact with any friend and family members, the degree of police influence exerted over him, and the threat of federal prosecution which all played on Davis' fear of being tried in the federal system where it is common knowledge that the penalties are significantly harsher. All of these factors rendered his July 20, 2012 statements involuntary.

The government opposes the motion asserting Davis was interviewed by LVMPD Detective Ray Martinez, and ATF Special Agent Mike LaRusso on July 20, 2012, at CCDC after *Miranda* warnings were given and waived. The government maintains that Davis agreed to speak with law enforcement, and admitted that he purchased the firearm recovered from his apartment from someone named "Sleez" for $250 or $350 on July 5, 2012. Davis also reportedly told officers that the apartment searched was leased only to him, although his sister and some friends stayed at the apartment from time to time. Additionally, he admitted that he bought cocaine in ounces and sometime sold it to his friends who would come over to smoke "weed" and "coke."

3

The government argues that Davis made spontaneous statements to LVMPD Detective Bruno on July 19, 2012. The motion erroneously claims that the statements made the following day on July 20, 2012, to Detective Martinez and ATF Special Agent LaRusso must be suppressed pursuant to *United States v. Wauneka*, 770 F.2d 1434 (9th Cir. 1985).

Detective Bruno's report indicates that Davis was arrested on robbery charges and transported to ISD headquarters. While waiting transport to CCDC, Detective Bruno decided not to interview Davis because the case would potentially be assigned to a task force and prosecuted federally. Detective Bruno entered the interview room to advise the Defendant of the delay in transporting him. When Detective Bruno entered the room, Davis asked why he was arrested. Detective Bruno told Davis that he was being charged with robbery of his former girlfriend. Davis then reportedly responded that he believed the charges concerning his former girlfriend would be dropped, but that he was "got" on the "Teflon bullets, maybe the guns found in the apartment." Davis asked Bruno if the new charges meant that they were going to revoke his bond on a pending state case on which he was out on bail. Bruno told Davis that his case would likely go federal. Davis then offered to provide information about the people from whom he got the guns, drugs and ammunition in California. According to the government, Detective Bruno advised Davis that he was only responsible for the robbery charge. Davis insisted that he wanted to talk to "whoever was going to bring additional charges" on him and was willing to cooperate to "getting big dope" and "lots of guns."

On July 20, 2012, at approximately 3:13 p.m., Task Force Detective Martinez and ATF Special Agent Michael LaRusso interviewed Davis at CCDC. Detective Martinez advised Davis of his *Miranda* rights which Davis acknowledged that he understood and waived. Davis went on to admit possession of the firearms, ammunition, a ballistic vest, cocaine and marijuana. In short, the government argues that Davis' July 19, 2012, statements were spontaneous, volunteered admissions that are admissible despite the absence of a prior *Miranda* warnings. The government also argues that his subsequent admissions on July 20, 2012, should not be suppressed because *Miranda* warnings were administered and waived and the second interview was sufficiently attenuated from the allegedly involuntary statement made the day before.

4

**II.     Evidentiary Hearing Testimony.**

The government called Detective Bruno and Detective Martinez. Davis did not call any witnesses. The court canvased Davis about his knowledge and understanding of his right to testify or not. Specifically, the court inquired whether Davis understood he had the right to testify if he wished, but could not be compelled to testify if he did not want to, that the decision about whether or not to testify was up to him, and that if he decided he did not want to testify, his silence could not be commented on or used against him in any way. Davis stated that after conferring with counsel it was his decision not to testify.

**A.     Testimony of Detective Bruno**

Detective Bruno has been employed by LVMPD for thirteen years. In June 2012, he was working for the Robbery section. On June 27, 2012, he was assigned to investigate a street robbery involving two sisters. The victims said they knew the robber and his name was Tyrone Glenn. A criminal history was conducted and indicated Tyrone Glenn is an alias for Tyrone Davis. Detective Bruno prepared a six person photo array and showed it to both sisters who picked Davis out of the photographic lineup. From the criminal history check conducted, Detective Bruno knew Davis was a convicted felon. Under Nevada law, a convicted felon is prohibited from possessing a firearm.

Other officers assisting in the investigation developed an address for Davis at 6500 Vegas Dr., Bldg. 40, Apt. 2157. Investigating officers began surveillance of the apartment. Davis was apprehended in the parking lot and arrested for robbery. He was eventually transported back to headquarters while a telephonic search warrant for his apartment was obtained and executed. The search warrant sought to recover the clothing the suspect wore during the robbery and property listed by the victims as being taken. During execution of the search warrant, a firearm and ammunition were found.

Detective Bruno did not transport Davis to headquarters. Davis was transported to headquarters because an arrest document had to be completed before he could be booked into jail. Detective Bruno testified that he elected not to interview Davis because of the items recovered during the search warrant. Detective Bruno entered the doorway of the interview

1  room where Davis was being held to let Davis know what the delay was. Davis asked why he
2  had been arrested. Detective Bruno told him it was for the robbery of his former girlfriend.
3  Davis stated he believed the robbery charge would be dropped, but was concerned because of the
4  firearm and other items in his apartment. Davis told Detective Bruno he had information and
5  wanted to be interviewed. Detective Bruno told Davis that the only case he had was the robbery
6  charge and would not be interviewing Davis. Detective Bruno testified that he did not ask Davis
7  any questions. Detective Bruno prepared an officer's report that documents the statements Davis
8  made to him. The officer's report was marked and admitted as Government's Exhibit No. 1.
9  Page 3 of the report summarizes the conversation he had with Davis.

10  On cross-examination, Detective Bruno testified that Davis was clearly taken into
11  custody on July 19, 2012, on robbery charges. Davis was transported to headquarters and placed
12  in an interview room in handcuffs waiting to be transported to the jail. Detective Bruno did not
13  give Davis *Miranda* warnings and was not aware if anyone else gave Davis *Miranda* warnings.
14  Detective Bruno made a decision not to interview Davis and not to give him *Miranda* warnings
15  because he believed the case would be assigned to a task force detective and prosecuted
16  federally. Detective Bruno only entered the room standing in the doorway to explain to Davis
17  why it was taking so long to transport him to jail as a common courtesy.

18  Davis asked about being interviewed. Davis said he wanted to speak. Davis started to
19  make statements which Detective Bruno characterized as spontaneous utterances. Detective
20  Bruno testified that he did not elicit any statement. When Davis asked about being interviewed,
21  Detective Bruno told him he was not going to interview Davis because his statements were not
22  pertaining to the robbery investigation. When detective Bruno told Davis that the case was
23  probably going in a different direction other than state, he meant the case would be federally
24  prosecuted. Detective Bruno agreed with defense counsel that it is common knowledge that
25  when a case goes federal, "a lot more time is involved" than the state penalties for robbery, gun
26  and drug crimes.

27  Detective Bruno stated he decided not to interview Davis as a courtesy to his colleagues
28  because he did not know in what direction they were going to go and did not want to interfere

with their investigation. This is the reason why he did not give Davis *Miranda* warnings. However, Detective Bruno acknowledged that he listened to Davis when he spoke. Detective Bruno denied that he solicited any response, but acknowledged that he answered Davis' questions. He testified that the conversation with Davis was very short. After his short conversation with Davis, Detective Bruno went back to the computer and wrote the rest of his report including the substance of his conversation with Davis. He spoke with other Metro detectives about his contact with Davis in the doorway.

On redirect, Detective Bruno reiterated that Davis said he believed the robbery charge would be dropped. Davis was concerned about being in possession of the gun and other items in his apartment. He was also concerned about his state bond being revoked. Detective Bruno told Davis that he did not know what would happen with his state bond if federal charges were brought.

**B.     Testimony of Raymond Martinez**

Detective Martinez recently retired from LVMPD on December 14, 2015, after 27 years. In 2012, he was assigned to an LVMPD and ATF task force investigating firearms and narcotics cases. He was not present on July 19, 2012, when Davis was arrested. He first contacted Davis on July 20, 2012, at CCDC and interviewed him there. He was accompanied by Special Agent Michael LaRusso because it is protocol to have more than one officer in the room during an interview. Davis was interviewed concerning his arrest because of firearms and narcotics recovered from his apartment. The interview was not recorded because this was not mandated by policy at the time. After the interview, Martinez prepared an ATF report of investigation. He identified Government's Exhibit No. 2 which was marked and admitted in evidence as his report of the interview. It fairly and accurately reports the results of his interview with Davis.

Prior to conducting the interview, Detective Martinez read Davis his *Miranda* rights from a standard LVMPD card. Martinez had a copy of the card he used and read the rights that were administered into the record. His report documents that he read *Miranda* rights to Davis. He gave Davis an opportunity to ask any questions about any of his rights. Davis said he wished to speak. Davis acknowledged he understood his rights.

1  Martinez characterized Davis as fully cooperative and very relaxed during the interview. At the time of the interview, Martinez was aware that Davis had a felony conviction. Martinez did not threaten Davis at any point during the interview. Davis did not ask to use the restroom, for water, or for anything else during the interview.

Detective Martinez testified the interview lasted approximately 30-45 minutes. Davis did not indicate at any point that he did not want to speak or wanted to terminate the interview.

Detective Martinez testified at the grand jury. He reviewed his grand jury testimony before testifying at the evidentiary hearing. He was asked if there was anything in error in his testimony before the grand jury on August 20, 2013. Detective Martinez testified that AUSA Silva asked Martinez if he interviewed Davis the day after his arrest. However, the transcript of the question she asked indicated that the following day was July 25, 2012. This was an error. The interview occurred July 20, 2012. Martinez's only other contact with Davis was when he went to Pahrump where Davis was detained to collect a DNA sample. While collecting the sample, there was no discussion of Davis' case.

Prior to interviewing Davis on July 20,2012 Martinez was given access to the police reports that other detectives prepared. From the reports, Martinez got "basically the meat and potatoes" of what had been done. He read Detective Bruno's report and was aware of the statements Davis made on July 19, 2012.

## DISCUSSION

**I.  Defendant's Statements**

The government has the burden of proving, by a preponderance of the evidence, whether a confession is voluntary. *See Lego v. Twomey*, 404 U.S. 477, 489 (1972). The government must also establish, by a preponderance of the evidence, that a defendant waived his protection against self-incrimination under *Miranda*. *Colorado v. Connelly*, 479 U.S. 157, 158 (1986).

**A.  The Requirement for *Miranda* Warnings.**

*Miranda* warnings are necessary when a suspect in custody is interrogated by police. *See Thompson v. Keohane*, 516 U.S. 99, 102 (1995). In *Rhode Island v. Innis*, 446 U.S. 291 (1980), the Supreme Court has defined interrogation as "express questioning or its functional

8

equivalent." 446 U.S. at 300-01. The Supreme Court and courts of appeal have repeatedly emphasized that many types of questions are not considered interrogation and do not require *Miranda* warnings. For example, questions asked of a motorist temporarily detained in a traffic stop do not require *Miranda* warnings. *See Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975)). Asking a suspect questions regarding general biographical information is not interrogation. *United States v. Foster*, 227 F.3d 1096, 1103 (9th Cir. 2000).

Even a prisoner isolated from the general population and questioned about contact outside of the prison does not necessarily create a custodial situation for purposes of the necessity to give *Miranda* warnings. *Howes v. Fields*, 132 S.Ct 1181, 1188-90 (2013) ("Imprisonment alone is not enough to create a custodial situation within the meaning of *Miranda*.") The test for determining whether a prisoner is in custody for *Miranda* purposes and therefore entitled to *Miranda* warnings should focus on all of the features of the interrogation including: (1) the language that is used in summoning the prisoner to the interview; and (2) the manner in which the interrogation is conducted. *Id.*, at 1192. In *Howes*, the inmate was removed from general population and interrogated for 5-7 hours by armed deputies, but was told that he could leave the interrogation and return to his cell whenever he wanted. He was offered food and water and was not restrained. Under these circumstances, the Supreme Court held that the defendant was not in custody for *Miranda* purposes.

For purposes of the requirement to administer *Miranda* warnings, the court examines the words or actions on the part of the police, other than those normally attendant to arrest and custody, that the police should know are reasonably likely to illicit an incriminating response. *United States v. Morgan*, 738 F.3d 1002, 1005-06 (9th Cir. 2013); *see* also *Arizona v. Mauro*, 481 U.S. 520, 526 (1987). Both cases held that for purposes of the requirement to administer *Miranda* warnings, "interrogation" refers to express questioning or its functional equivalent. The investigating officer's subjective intent is relevant, but "the focus is primarily on the perception of the defendant" in examining whether the questions posed were "reasonably likely to illicit an incriminating response." *United States v. Chen*, 439 F.3d 1037, 1040 (9th Cir. 2006) (citations

omitted). Not every question in a custodial setting constitutes interrogation. *Id.,* (citing *United States v. Booth*, 669 F.2d 1231, 1237 (9th Cir. 1981)).

"Spontaneous or volunteered confessions of a suspect in custody are admissible despite the absence of a prior *Miranda* warning." *United States v. Sherwood*, 98 F.3d 402, 409 (9th Cir. 1996) (internal quotation and citation omitted). *See* also *Beaty v. Stewart*, 303 F.3d 975, 991 (9th Cir. 2002), (holding spontaneous confession made by a prisoner to a jail psychiatrist was not the result of interrogation and *Miranda* warnings were therefore not required.)

Here, it is undisputed that Davis was under arrest for robbery when he was taken from his apartment complex to headquarters and placed in an interview room while Detective Bruno prepared his report and arrest documents. It is also undisputed that Davis made incriminating admissions in the brief conversation that Detective Bruno had with him in the doorway to the interview room to explain the delay in transporting him to jail. The court finds that although Davis was in custody, he was not subjected to custodial interrogation by this brief conversation with Detective Bruno. The court found Detective Bruno credible that he entered the room merely as a courtesy to inform Davis of the reason for the delay in transporting him to jail, and that Davis initiated a conversation about being interviewed. Davis inquired why he was under arrest. Detective Bruno told Davis he was under arrest for the robbery of his former girlfriend. Davis responded that he was not concerned about that charge and believed it would be dropped. However, he was concerned about being prosecuted federally because of the gun, ammunition and Teflon vest found in his apartment. Davis offered to cooperate and provide information about drugs and guns.

The court found Detective Bruno credible that he deliberately decided not to interview Davis because he was aware the case would likely be assigned to task force detectives and prosecuted federally. As a professional courtesy, he did not want to interfere with that investigation. Detective Bruno was only assigned to the robbery charge, and specifically informed Davis that he would not be interviewing Davis because he was only assigned to the robbery case. In short, the court concludes that Detective Bruno's contact with Davis in the

doorway to the interview room did not constitute an interrogation. *Miranda* warnings were therefore not required for the conversation that occurred on July 19, 2012.

It is undisputed that the July 20, 2012 interview was a custodial interrogation. There is a distinction between a claim that a *Miranda* waiver was not voluntary and a claim that a *Miranda* waiver was not knowing and intelligent. The voluntariness of a waiver has always depended on the absence of police overreaching. *See Connelly,* 479 U.S. at 170. Although courts often merge the two-pronged analysis, the components should not be conflated. *See Cox v. Del Papa*, 542 F.3d 669, 675 (9th Cir. 2008). First, a valid *Miranda* waiver requires a showing that it was voluntary and the product of a free and deliberate choice rather than the product of intimidation, coercion, or deception. Second, a valid *Miranda* waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *See United States v. Frank*, 956 F.2d 872, 877 (9th Cir.1992). Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court conclude that *Miranda* rights have been waived. *Id.* at 877.

It is undisputed that Detective Martinez and LaRusso went to CCDC the day after Davis' arrest to interview him about the items recovered from his apartment during execution of the search warrant.

The court finds that under the totality of the circumstances surrounding Davis' interview on July 20, 2012, Davis knowingly and intelligently waived his rights against self-incrimination. The warnings were read to Davis from a standard LVMPD advisement of rights card and read into the record at the evidentiary hearing. Detective Martinez testified that Davis indicated he understood and waived his rights. In fact, it is undisputed that Davis was eager to be interviewed, and offered to provide information. Davis knew he was likely to be prosecuted federally because of the items he knew were in his apartment and would likely be recovered in the search. The most reasonable inference from Detective Bruno's testimony is that Davis wanted to provide information to the detectives assigned to the possible federal prosecution hoping for some reciprocal consideration.

The court found Detective Martinez credible that Davis was fully cooperative and relaxed during the interview. Davis acknowledged understanding his rights and wanted to speak with Martinez. Under the totality of the circumstances presented here, Davis made a deliberate decision to waive his *Miranda* rights. *See United States v. Garabay*, 143 F.3d 434, 536 (9th Cir. 1998) ("A valid waiver of *Miranda* rights depends on the totality of circumstances including the background, experience and conduct of the defendant."). Davis was aware of the nature of the rights being abandoned and the consequences of the decision to abandon his rights against self-incrimination. The court also finds that Davis' waiver of his rights against self-incrimination was voluntary and the product of a free and deliberate choice, rather than intimidation, coercion, or deception. *Berghuis v. Tompkins*, 560 U.S. 370, 383-84 (2010).

### B. Voluntariness

A statement is voluntary where it is "the product of a rational intellect and free will." *See United States v. Kelley*, 953 F.2d 562, 564 (9th Cir. 1992) (*citing Blackburn v. Alabama*, 361 U.S. 199, 208 (1960)). In examining the voluntariness of a confession, the court must consider "whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution." *See Derrick*, 924 F.2d at 817. In addition, the Supreme Court has determined that coercive police activity is a necessary predicate to a finding that a confession is not voluntary. *See Connelly*, 479 U.S. at 167. It is the government's burden to prove that a confession was voluntary by a preponderance of the evidence. *See United States v. Jenkins*, 958 F.2d 934, 937 (9th Cir. 1991) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)); *Connelly*, 479 U.S. at 168.

To determine whether a confession is voluntary, the court applies a totality of the circumstances test. *See United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988). The court determines whether, "considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion, or by improper inducement so that the suspect's will was overborne." *Id*. In assessing the voluntariness of a confession, the court considers "the totality of all the surrounding circumstances—both the characteristics of

///

the accused and the details of the interrogation." *Gifferson v. United States*, 530 U.S. 428, 434 (2000).

The court finds that Davis' statements to Detective Bruno on July 19, 2012, and statements to Detective Martinez and LaRusso on July 20, 2012, were voluntary. Nothing in the record supports a finding that statements on either day were obtained in a manner incompatible with the requirements of the Constitution. At most, Davis was told that he was likely to be prosecuted federally, and aware that a federal prosecution would involve stricter penalties than a state prosecution. However, it is clear to the court that Davis wanted to talk to the police in hope that his cooperation would result in some consideration. The totality of the circumstances of both sets of statements indicate that Davis' statements were not the result of any physical or psychological coercion, or improper inducement. Davis' will not was overborne by any police conduct.

**II.     Davis Taint Arguments**

The motion to suppress argues that the July 19, 2012, statements Davis made to Detective Bruno before *Miranda* warnings were administered, tainted the July 20, 2012 statements made to Detectives Martinez and LaRusso. The court has found that Davis was not subjected to custodial interrogation by Detective Bruno on July 19, 2012.

Davis does not explicitly claim that law enforcement subjected him to an unlawful two-step interrogation. However, even if this is his claim, the elements of a two-step interrogation did not occur in this case. The Supreme Court has held that when police deliberately fail to advise a suspect of *Miranda* rights, extract an incriminating statement, then advise the suspect of his *Miranda* rights and extract the same statements from the suspect, the statements are inadmissible even in the absence of coercion. *Missouri v. Siebert*, 542 U.S. 600, 611-12 (2004). A statement taken post-*Miranda* during a deliberate two-step interrogation may be suppressed. The following factors are applied to determine whether the police engaged in a two-step interrogation: (1) whether the officer deliberately questioned the suspect without *Miranda* warnings; (2) obtained a confession or inculpatory information; (3) offered mid-stream warnings after the suspect admitted involvement or guilt; and (4) then had the suspect repeat his

13

confession or elaborate on his earlier statements. *United States v. Barnes*, 713 F.3d 1200, 1205 (9th Cir. 2013). In determining whether law enforcement deliberately employed the two-step interrogation tactic, the court should consider whether the objective evidence and any subjective evidence support the inference that the two-step interrogation technique was used to undermine the *Miranda* warnings. *Id.* If law enforcement officers did not deliberately utilize a two-step strategy to weaken *Miranda*'s protections, then the statement are admissible if they are voluntary. *United States v. Williams*, 435 F.3d 1148, 1157-58 (9th Cir. 2006).

The court finds the officers involved in taking statements from Davis did not engage in a deliberate two-step interrogation. For the reasons explained in the preceding section, the court finds that Davis made spontaneous statements to Detective Bruno on July 19, 2012. He was not subjected to custodial interrogation. He was not questioned about the items found in his apartment that resulted in this federal prosecution. Detective Bruno was assigned to the robbery charge, and explicitly informed Davis he would not interview him. Detective Bruno made a deliberate choice not to interview Davis about the potential federal charges as a curtesy to his colleagues because he did not want to interfere with their investigation. His conversation with Davis in the doorway of the interview was not the first step of a two-step interrogation. Davis' July 20, 2012 statements were given only after Davis received and waived Miranda warnings.

For the reasons explained,

**IT IS RECOMMENDED** that Davis' Motion to Suppress (Dkt. #147) be **DENIED.**

DATED this 29th day of December, 2015.

PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE

14