UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

UNITED STATES OF AMERICA,

Plaintiff,

v.

TYRONE DAVIS,

Defendant.

Case No. 2:12-cr-00289-JCM-PAL

**REPORT OF FINDINGS AND RECOMMENDATION**

(Mots. to Withdraw Guilty Plea – ECF Nos. 255, 264; Mot. to Strike – ECF No. 256)

This matter is before the court on Defendant Tyrone Davis' Motions to Withdraw Guilty Plea (ECF Nos. 255, 264) (the "Motions") and the government's Motion to Strike (ECF No. 256). These Motions were referred to the undersigned on August 31, 2016, pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4 of the Local Rules of Practice.

<u>**BACKGROUND**</u>

On August 7, 2012, a federal grand jury returned an Indictment (ECF No. 1) against Mr. Davis.  During his  initial appearance and arraignment, Davis pled not guilty to the charges and was detained pending trial.  Aug. 17, 2012 Mins. of Proceedings (ECF No. 11); *see also* Order of Detention (ECF No. 13).  On August 13, 2013, a federal grand jury returned a Superseding Indictment (ECF No. 46) charging Mr. Davis with three counts: Count 1 – possession of a firearm by a convicted felon in violation 18 U.S.C. §§ 922(g)(1) and 924(a)(2); Count 2 – possession of cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and Count 3 – possession of a firearm in relation to a drug trafficking offense in violation of 18 U.S.C. §§ 922(g)(1) and 924(c)(1)(A)(i).  Mr. Davis was arraigned on the Superseding Indictment and pled not guilty on all three counts.  Aug. 22, 2013 Mins. of Proceedings (ECF No. 53).

After multiple stipulated continuances and changes of defense counsel, trial was set for June 6, 2016, before the Honorable James C. Mahan, United States District Judge.  *See* May 10,

1

2016 Order (ECF No. 221).  However, after a jury was empaneled, Davis withdrew his plea of not guilty and entered a guilty plea.  June 6, 2016 Mins. of Proceedings (ECF No. 245).  Based on Davis' guilty plea, the district judge vacated the trial.  *Id*.  Davis subsequently filed a pro se Motion to Dismiss Counsel (ECF No. 251) and Motion to Withdraw Guilty Plea (ECF No. 255).  The court appointed new counsel, *see* Mins. of Proceedings (ECF No. 259), who filed the second Motion to Withdraw Guilty Plea (ECF No. 264) on Davis' behalf.  After the matter was referred the court set the matter for an evidentiary hearing.  Sept. 7, 2016 Min. Order (ECF No. 268).

I.    **DAVIS' MOTIONS TO WITHDRAW HIS GUILTY PLEA**

On September 20, 2016, the court held an evidentiary hearing on Davis' Motions.  Phillip Smith and Lisa Cartier-Giroux appeared for the government and Kevin Stolworthy appeared for Davis who was also present and testified.  The court has considered the Motions, Response (ECF No. 265), Reply (ECF No. 266), evidence introduced at evidentiary hearing, and the post-hearing supplemental briefs (ECF Nos. 284, 292).  The court has also considered the testimony and arguments reflected in the transcripts of the May 27, 2016 hearing regarding motions for withdrawal of counsel, the June 6, 2016 trial proceedings and change of plea conducted by the district judge, and the September 20, 2016 evidentiary hearing.  *See* May 27, 2016 Hr'g Tr. (ECF No. 270); May 27, 2016 *Ex Parte* Hr'g Tr. (ECF No. 271); June 6, 2016 Day 1 Jury Selection Tr. (ECF No. 260); June 6, 2016 *Ex Parte* Hr'g Tr. (ECF No. 261); June 6, 2016 Change of Plea Tr. (ECF No. 249); Sept. 20, 2016 Evid. Hr'g Tr. (ECF No. 278).

A.    **Davis' Position**

In his pro se Motion (ECF No. 255), Davis contends that he was forced to enter a guilty plea because of the court's refusal to dismiss his prior defense counsel, James Oronoz, despite knowing of the "irreconcilable conflict" between Davis and Oronoz.  *Id*. at 3.  Davis claims that Oronoz threatened to ensure Davis was convicted and "snap his little neck."  *Id*.  Davis states that Oronoz was unprepared for trial and had no defense strategy or witnesses.  *Id*.  Oronoz advised Davis that "straight up guilty plea would avoid any possible trial enhancements."  *Id*.  Davis states that he realized he would be convicted because of Oronoz's inadequate representation; thus, he decided to enter a "straight up guilty plea."  *Id*.  However, Davis asserts he was "blindsided by the

government into a stipulation not charged in the indictment." *Id*.  Davis argues that his guilty plea was not knowing and voluntary because he was not previously advised of the government's stipulation and did not willingly admit to that stipulation.  *Id*.  Davis contends that Oronoz's mischaracterization of the sentence Davis was likely to receive and the resulting misunderstanding is a fair and just reason for the court to allow him to withdraw his plea.  *Id*.

In the second Motion (ECF No. 264) filed by Davis' new counsel, Davis challenges the adequacy of his guilty plea arguing that he did not fully understand what it meant to plead guilty without benefit of a plea agreement.  *Id*. at 7.  The plea, Davis claims, was "entered hastily and with considerable confusion," and the confusion was primarily because Oronoz failed to adequately explain the plea process.  *Id*.  Davis states he was caught off guard when the district judge asked for factual admissions and he did not know he would be required to admit facts in order to plead guilty.  *Id*.  The transcript is "unclear as to exactly what facts Davis ultimately agreed to which could form the basis for Count Three."  *Id*. at 8.  Davis purportedly expressed a lack of understanding of federal sentencing guidelines, the charging statutes, and the "§ 851 Notice" filed by the government shortly before the trial.  *See* Information & Notice Pursuant to 21 U.S.C. § 851(a) (ECF No. 243).  Davis states that neither the government nor Oronoz attempted to proceed with trial, "but instead allowed Davis to enter a guilty plea without agreeing to facts" that form a basis for Count 3.  Mot. (ECF No. 264) at 8.  Davis further asserts that his counsel did not fully apprise him of the benefits and risks of prior plea offers.  *Id*.  If the prior plea offers had been explained, Davis "would not have entered into the plea agreement in the manner in which he ultimately did."  *Id*.  Davis' failure to comprehend the terms, conditions, and consequences of his plea is a fair and just reason for the court to allow him to withdraw his plea under Rule 11(d)(2)(B) of the Federal Rules of Criminal Procedure.[1]

### B.    The Government's Position

The government asks the court to deny Davis' Motions because his plea colloquy demonstrates that his guilty plea was knowing, voluntary, and uncoerced.  The government argues that, prior to changing his plea, Davis repeatedly rejected plea agreements that would have required

---

[1]  All references to a "Rule" or "Rules" in this Order refer to the Federal Rules of Criminal Procedure.

him to agree to a sentencing guideline calculation, his status as a career offender pursuant to U.S.S.G. § 4B1.1(a), and waive his right to appeal the court's adverse decisions regarding his motions to suppress.  *See* Gov't's Response (ECF No. 265) at 1–2.  The plea agreements that were offered informed Davis the government would not seek to challenge the appeal of his pretrial motions under Rule 11(a)(2).  *Id.* at 2.  Thus, Davis made a calculated decision to enter a guilty plea without an agreement.  *Id.*

The government points out that, during the plea colloquy, the district judge asked Davis numerous questions to ensure that his guilty plea was knowingly, intelligently, and voluntarily made.  *Id.* at 3.  The district judge advised Davis of his rights, and confirmed he understood his rights, the nature of the charges against him, and the consequences of pleading guilty.  *Id.*  In particular, the government argues that the district judge thoroughly questioned Mr. Davis to assure there was a factual basis for the guilty plea pursuant to Rule 11.  *Id.*  Although Davis had previously expressed differences of opinion with his counsel, Davis stated that he had discussed the guilty plea with his lawyers, and that he was satisfied with their representation.  *Id.* at 3 n.2.  Mr. Davis' statements during the plea colloquy and responses to the court's questions flatly contradict his current claim that he did not understand the consequences of the guilty plea or adequately articulate a factual basis to support the plea.  *Id.* at 3–4.  The government argues that Davis "repeatedly demonstrated a comprehension of what he was doing" and questioned the district judge when he did not completely understand something the judge stated.  *Id.* at 4.  Contrary to Davis' contention that he did not understand the sentencing guidelines, the record shows that a preliminary presentence report ("PSR") was ordered and his counsel discussed the PSR with Davis at length.  *Id.* at 4 n.3.  Davis did not agree with the PSR's conclusions "as to his status as a Career Offender and the potential applicable guidelines if found guilty after trial;" however, he was clearly aware of the PSR's existence as well as its contents and conclusions.  *Id.*

With regard to the factual basis for Davis' plea, the government asserts that the detailed colloquy included multiple questions about the underlying facts of the case, and such inquiries are strong evidence that Davis understood the meaning of his guilty plea.  *Id.* at 4–5.  Upon repeated questioning by the district judge and the government, Davis "ultimately admitted that he possessed

the cocaine to provide that cocaine to his friends." *Id*. at 5. He admitted that "he possessed the gun to protect his person from being robbed, and further agreed that he possessed the gun to protect himself from being robbed in conjunction with him distributing cocaine to his friends." *Id*. Davis believed that a jury would find him guilty and admitted facts consistent with his belief. *Id*. The colloquy demonstrates that Davis' guilty plea was knowing, voluntary, and uncoerced, and there was a sufficient factual basis. The government asserts that Davis has not shown a fair and just reason why he should be permitted to withdraw his plea, and therefore his Motions should be denied. *Id*. at 6.

The following procedural history is relevant to Mr. Davis' pending Motions.

## II.   CHANGES OF COUNSEL REPRESENTING MR. DAVIS

### A.   Davis' First Attorney – the Federal Public Defender

Initially, the court appointed the Federal Public Defender for the District of Nevada ("FPD") as counsel for Mr. Davis. Aug. 17, 2012 Order (ECF No. 8); Mins. of Proceedings (ECF No. 11). The FPD subsequently filed a sealed Motion to Withdraw as Counsel (ECF No. 15), citing a conflict with another client. The court relieved the FPD as counsel of record and appointed Karen Connolly to represent Mr. Davis. Sept. 25, 2012 Mins. of Proceedings (ECF No. 18); Order (ECF No. 19).

### B.   Davis' Second Attorney – Karen Connolly, Esq.

On December 11, 2012, Davis filed a pro se Motion to Dismiss Counsel (ECF No. 22). Shortly thereafter, Ms. Connolly filed a Motion to Withdraw (ECF No. 24) stating that an "irrevocable breakdown in communication" had occurred. The court granted the motions and appointed Todd Leventhal to replace Ms. Connolly. Dec. 21, 2012 Order (ECF No. 26); Mins. of Proceedings (ECF Nos. 25, 27).

### C.   Davis' Third Attorney – Todd Leventhal, Esq.

In March 2013, Mr. Leventhal filed a Motion to Suppress (ECF No. 31) on Davis' behalf, arguing that the underlying warrant lacked probable cause and was based on material misrepresentations. *See also* Gov't's Response (ECF No. 32). The undersigned issued a Report of Findings and Recommendation (ECF No. 33) recommending that the suppression motion be

5

1  denied.  The district judge adopted the Report of Findings and Recommendation and denied Davis'

2  suppression motion.  May 21, 2013 Order (ECF No. 35).

3       In July 2013, Mr. Davis filed a second pro se Motion for Appointment of Counsel (ECF

4  No. 39) asking the court to dismiss Leventhal and appoint new counsel because he felt that counsel

5  was not effectively representing him.  After inquiring of government counsel whether they had

6  any reason believe the motion was brought for any improper purpose or to delay the proceedings,

7  the court excused government counsel and conducted a sealed *ex parte* hearing on the motion to

8  discuss the matter with Davis and Leventhal.  July 23, 2013 Mins. of Proceedings (ECF No. 41).

9  The court was not satisfied that a conflict required replacement counsel and denied the motion

10  after inquiring into the specifics of Davis' concerns.  *Id.*

11       Weeks later, Davis filed a third Motion to Dismiss Counsel and Appoint New Counsel

12  (ECF No. 43) arguing that Mr. Leventhal did not afford him an opportunity to review and discuss

13  draft motions to suppress prior to their filing.  Davis stated he was dissatisfied that Mr. Leventhal

14  did not file a reply in support of the motion to suppress.  Davis also asserted that counsel had not

15  been truthful about the contents and dates of filing the pretrial motions.  The court found that

16  Davis' newest "dispute" with counsel was "essentially a repetitive attempt to dictate Mr.

17  Leventhal's tactical and strategic decisions in how to defend this case."  Aug. 19, 2013 Order (ECF

18  No. 50).  The court denied Davis' motion, noting:

19       The court has carefully canvassed Davis regarding his concerns about Mr.
         Leventhal's representation and explained what decisions are his to make and what
20       decisions a trained legal professional makes in defending a criminal case. Davis is
         and has been dissatisfied with the legal advice he has received from all three of the
21       lawyers appointed to represent him because they will not tell him what he wants to
         hear or file whatever he wants filed.
22

23  *Id.* at 2:22–26.  *See also* Aug 20, 2013 Am. Order (ECF No. 51) (correcting typographical errors).[2]

24       In December 2013, Davis filed a fourth pro se Motion to Appoint Counsel (ECF No. 61)

25  once again asking that Leventhal be dismissed.  The court conducted a sealed *ex parte* hearing

26

27  [2] Davis filed a Notice of Appeal (ECF Nos. 54, 84) regarding the Order (ECF No. 50), but later filed a
    motion to voluntarily dismiss the appeal.  The Ninth Circuit Court of Appeals granted the motion and
28  dismissed the appeal.  *See* Order (ECF No. 91).

1   during which Davis withdrew the motion after his concerns were addressed.  Dec. 17, 2013 Mins.

2   of Proceedings (ECF No. 63).

3          In January and February 2014, Davis filed a fifth and sixth Motion to Dismiss Counsel and

4   Appoint New Counsel (ECF Nos. 65, 66).  Davis also sent a letter to the district judge asking for

5   a response to his motions.  Feb. 2014 Davis Letter (ECF No. 68).  The district judge forwarded the

6   letter to Mr. Leventhal for appropriate action.  *Id*.  In the fifth motion, Davis vaguely stated that

7   Leventhal was not "truthful in restoring communication between counsel and Defendant."  Mot.

8   (ECF No. 65) at 1:24–25. In the sixth motion, Davis asserted that Leventhal has not been truthful

9   about the fact that he represented Davis in 2003 when Davis was a government witness in an

10  unrelated prosecution.  Mot. (ECF No. 66).  As a result, Davis asserted there were irreconcilable

11  differences between him and Leventhal.  The court denied these motions stating that it would not

12  "keep reappointing new counsel until he gets a lawyer who tells him what he wants to hear, or

13  agrees with him on everything, or files whatever motions Davis wants him to file whether or not

14  they have merit."  Mar. 3, 2014 Order (ECF No. 71) at 3.  The court found that Davis had been

15  dissatisfied with the legal representation he had received from all three of the lawyers appointed

16  to represent him.  *Id*.  The court also noted that, pursuant to LR IA 10-6(a), "a party who has

17  appeared through counsel in a case cannot appear or act in the case while represented."  *Id*.[3]

18         Davis sent another letter to the district judge in March 2014, stating that he had done

19  everything in his power to have his attorney removed from his case.  *See* Letter (ECF No. 74).  In

20  April 2014, Davis filed a Motion Requesting an Order to Have Attorney Turn Over All

21  Exculpatory Evidence to Defendant (ECF No. 77) and Motion for Post-Trial Evidentiary Hearing

22  to Compel Disclosure of All Exculpatory Evidence (ECF No. 78).  The court ordered these motions

23  stricken from the record because Davis filed the motions pro se, despite being represented by

24  counsel.  May 20, 2014 Order (ECF No. 88).  The court expressly informed Mr. Davis that "LR

25  IA 10-6(a) provides that a party who is represented by counsel cannot appear or act in a case.  The

26

27  [3]  Davis filed a Notice of Appeal (ECF No. 72) regarding the Order (ECF No. 71) denying his motions.
    However, the Ninth Circuit dismissed the interlocutory appeal for lack of jurisdiction.  *See* Order (ECF
28  No. 76).

attorney who has appeared for a party has control of the client's case." *Id.*

On April 30, 2014, Mr. Leventhal filed a Motion to Withdraw as Attorney (ECF No. 79), which was followed the next day by Davis' seventh pro se Motion to Dismiss Counsel and Appointment of New Counsel (ECF No. 80). Mr. Leventhal stated that an irreconcilable conflict of interest had arisen between him and his client. Davis' motion stated that the facts were already established on the record to demonstrate the irreconcilable differences between him and his counsel. The court held a sealed ex parte hearing and denied the motions. May 13, 2014 Mins. of Proceedings (ECF No. 85).

In June and July 2014, Mr. Davis filed his eighth and ninth pro se Motions to Dismiss Counsel and Appointment of New Counsel (ECF Nos. 96, 98). He also sent two more letters to the district judge. *See* Davis Letters (ECF Nos. 97, 100). The court summarily denied Davis' eighth and ninth motions. Aug. 4, 2014 Order (ECF No. 101).

On August 15, 2014, Mr. Leventhal filed a second Motion to Withdraw as Attorney (ECF No. 103), stating that the attorney-client relationship has deteriorated to the point that he believed he could not represent Mr. Davis any further. Davis subsequently filed a tenth pro se Motion to Dismiss Counsel and Appointment of New Counsel (ECF No. 106). The court conducted a sealed *ex parte* hearing on the motions. Aug. 28, 2014 Mins. of Proceedings (ECF No. 107). Among other things, Mr. Leventhal advised the court that he and his staff had been physically threatened by Davis, and staff was afraid to interact with him. Davis denied any threats. The court granted the motions and appointed Mr. Oronoz as Davis' counsel. *Id.*

**D.      Davis' Fourth Attorney – James Oronoz, Esq.**

1.      Pretrial Motions filed by Mr. Oronoz

Over the next 11 months, Mr. Oronoz filed multiple pretrial motions on behalf of Mr. Davis, including two more suppression motions. *See, e.g.*, Mot. Conduct Pre-Plea Presentence Investigation Report (ECF No. 111); *Ex Parte* Mot. for Issuance of Subpoena (ECF No. 126); Mot. to Compel (ECF No. 138); Mots. to Suppress (ECF Nos. 144, 147); Mot. in Limine (ECF No. 148). However, in June 2015, Davis sent another letter to the district judge stating concerns regarding the timing of Oronoz's motion practice. *See* Davis Letter (ECF No. 143). Another letter in

1    December 2015 reiterated Davis' concerns that his case was being prolonged for the wrong reason.

2    *See* Letter (ECF No. 183).  Davis stated he had made it clear to his attorney and the government

3    that he would not be taking a deal.  *Id*.  Thus, he claimed he was being denied his speedy trial

4    rights and asked that any further requests for a trial continuance be denied.  *Id*.

5         On December 21, 2015, the court conducted an evidentiary hearing on Davis' Motions to

6    Suppress (ECF Nos. 144, 147).  *See* Mins. of Proceedings (ECF No. 185).  The undersigned

7    subsequently entered two Reports of Findings and Recommendations (ECF Nos. 187, 188)

8    recommending that the district judge deny the suppression motions.  The R&Rs prompted two

9    more letters to the district judge.  *See* Davis Letters (ECF No. 190, 191).  One simply asked for

10   "fairness" in reviewing the R&Rs, the other stated Davis' concern that Mr. Oronoz did not intend

11   to file objections to the R&Rs.  *Id*.; *see also* Letter to Counsel (ECF No. 196).  On January 13,

12   2016, counsel for Davis and the government submitted a Stipulation (ECF No. 192) to extend the

13   time to file objections to the R&Rs.  Mr. Davis concurrently submitted a pro se Objection (ECF

14   No. 193).[4]  The court extended the deadline, Order (ECF No. 194), and Oronoz timely filed

15   Objections (ECF Nos. 199, 200) to the R&Rs.  Davis submitted another letter to the district judge

16   in February 2016, which enclosed a disc of what he claimed was new evidence.  *See* Davis Letter

17   (ECF No. 197); *see also* Letter to Counsel (ECF No. 203).  The district judge adopted the R&Rs

18   in full and denied the suppression motions.  Mar. 14, 2016 Order (ECF No. 210).

19        On March 10, 2016, Mr. Oronoz filed a fourth Motion to Suppress (ECF No. 208) asking

20   the court to suppress Davis' statements based on inadequate *Miranda* warnings.  *See also* Gov't's

21   Response (ECF No. 213); Davis' Reply (ECF No. 214).  The undersigned entered a Report of

22   Findings and Recommendations (ECF No. 217) finding that the warnings Davis received complied

23   with *Miranda v. Arizona*, 384 U.S. 436 (1966), and recommending that Davis' suppression motion

24   be denied.  Mr. Oronoz filed on Objection (ECF No. 218) on behalf of Davis.  *See also* Gov't's

25   Response (ECF No. 224).

26

27   [4]  The government filed a Motion to Strike (ECF No. 198) Davis' pro se Objection.  However, the court
     denied the motion finding "no harm in allowing Mr. Davis an opportunity to preserve his belief on the

28   record" that the undersigned is personally biased against him.  *See* Mar. 9, 2016 Order (ECF No. 207).

In May 2016, while the fourth suppression motion was still pending, Oronoz filed a Motion in Limine (ECF No. 220) to exclude any evidence related to gang association.[5]  After numerous continuances, trial was set for June 6, 2016.  *See* May 23, 2016 Order (ECF No. 221).  However, Davis submitted two more letters to the district judge expressing concern regarding his attorney. Davis Letters (ECF Nos. 219, 225); *see also* Letter to Counsel (ECF No. 222).

## 2.   Davis' May 15, 2016 Letter to the District Judge

In his letter dated May 15, 2016, Davis said he was concerned that Oronoz was doing everything in his power "to make sure a plea is made in my case."  Davis Letter (ECF No. 225). Davis stated that he did not trust his counsel or the representation that he was facing significant time, "[t]o say that I'm faceing [*sic*] life is B.S. I want my trail [*sic*] now and any chances of a deal is now not up for consideration."  *Id*.  Davis wanted his trial to go forward on June 6.  *Id*.  A letter from Oronoz and his co-counsel, Lucas Gaffney, Esq., was also attached to Davis' letter.  *Id*.  Davis expressly indicated that he wanted Oronoz's letter to be filed on record.  *Id*.

The letter from Mr. Oronoz and Mr. Gafney that Davis asked to be made part of the record stated their concern that Davis did not understand the potential length of his sentence if he went to trial and was convicted on all counts:

> We realize that you do not like hearing advice about considering a negotiation, but at the risk of alienating you even further; we need to make sure you understand how much time you will be facing if you are convicted at trial. Although you may not choose believe what we are telling you in this regard, it is absolutely true.
>
> If you proceed to trial and are convicted on all counts, you will be facing a sentence of three hundred and sixty (360) months to life in prison. In other words, you are facing thirty (30) years to life in prison. Your criminal history combined with convictions for the instant offenses will very likely mean that you will remain incarcerated for the duration of you [*sic*] life.

*Id*.  Counsel indicated that both had spoken to Davis on numerous occasions about the plea negotiations the government's offers.  *Id*.  They tried to persuade Davis they were not acting against his interests by encouraging him to accept a deal.  *Id*.  Rather, they encouraged him "to consider a negotiation because the risk of going to trial and losing far outweighs the time [he] will

---

[5]  The district judge granted the Motion in Limine (ECF No. 220).  June 1, 2016 Order (ECF No. 229).

1    be facing by accepting a reasonable offer." *Id*.  Counsel also urged Davis to contact them if he

2    had any questions.  *Id*.

3                    3.    <u>May 27, 2016 Hearing on Oronoz's Motion to Withdraw</u>

4            On May 18, 2016, Mr. Oronoz filed a Motion to Withdraw as Attorney (ECF No. 223)

5    stating that the attorney-client relationship had deteriorated to the point where it was necessary for

6    him to withdraw.  The court conducted a hearing on this Motion.  *See* May 27, 2016 Mins. of

7    Proceedings (ECF No. 242); Hr'g Tr. (ECF No. 270); *Ex Parte* Sealed Hr'g Tr. (ECF No. 271).[6]

8    Government counsel represented they were prepared to go to trial as scheduled on June 6.  Hr'g

9    Tr. (ECF No. 270) at 2–3.  The court asked Mr. Davis if he wanted to go to trial with Mr. Oronoz.

10   *Id*. at 3.  Davis responded, "I just want to go to trial and go into the Ninth Circuit." *Id*.  The court

11   pointed out that he had not answered the question, and assured Davis he had every right to go to

12   trial if that was his choice.  *Id*.  Davis then pointed out that Mr. Oronoz' motion said it would be

13   in his best interests if he was permitted to withdraw.  *Id*.  The court told Davis that a sealed ex

14   parte hearing would be conducted so that no more confidential communications with counsel were

15   disclosed, but asked in the presence of government counsel "whether it is your intention to go to

16   trial and whether you want to go to trial on June the 6th." *Id*. at 3–4.  Davis responded, "Oh, it's

17   my intention to go to trial on June 6th." *Id* at 4.

18           Government counsel made representations about Davis' potential sentence and their

19   previous plea offers.  *Id*. at 4–8.  Specifically, the government stated that Davis' preliminary PSR

20   indicated he is a career offender and, if he is convicted on all three counts, he could be sentenced

21   to "30 years to life." *Id*. at 4.  Initially, the government offered to dismiss Count 3 and agree to a

22   sentence range of 168–210-months.  *Id*. at 5.  However, Davis told the court, in the presence of

23   counsel for the government,  he hadn't been able to challenge the criminal history outlined in the

24   PSR and he didn't know where he was at on the guideline because he "was given additional points

25

26   _____
     [6] As discussed in the September 20, 2016 evidentiary hearing, by placing his communications with Oronoz
27   at issue in his motion to withdraw his guilty plea, Davis has waived the attorney-client privilege for the
     communications between May 27 and June 6, 2016.  Thus, the court will summarize the Oronoz and Davis'
28   representations to the court during the sealed ex parte portion of the May 27, 2016 hearing.  *Ex Parte* Sealed
     Hr'g Tr. (ECF No. 271).

for things that overlapped each other." *Id*. at 6.  The court asked Davis about what he believed was wrong in the PSR.  *Id*. at 7.  Davis stated that the PSR inaccurately added his criminal history points: "the time lapse between the gross misdemeanors and misdemeanors, which the statute of limitation, as far as if you could count it as points or not.  *Id*. at 7:5–7.  He also said that he and Mr. Oronoz "never got a chance to sit down and actually go over my criminal history to see if it's accurate or not. So that -- I don't know where I'm at on the guideline period."  *Id*. at 7:12–14.  Government counsel represented that they had reviewed the PSR and believed the calculations to be correct.  *Id*. at 7–8.  The court then excused government counsel to conduct a sealed *ex parte* hearing with Davis and Oronoz.  *Id*. at 8.

Once government counsel left the courtroom, Oronoz told the court that he had gone over the PSR with Davis ad nauseam.  *Ex Parte* Sealed Hr'g Tr. (ECF No. 271) at 3–5.  Oronoz was clearly irritated by Davis' assertion that he had not gone over the sentencing guidelines and the conclusions reached in the PSR.  Oronoz represented that he had gone over the PSR with Davis. *Id*. at 4.  Counsel stated he investigated the accuracy of the PSR's calculations, but determined that the calculations were correct and there was no good faith legal basis to challenge the calculation. *Id*. at 5.  Oronoz told the court that Mr. Davis insisted on counsel filing "things that he thinks have legal merit," and that counsel had litigated every issue he could find.  *Id*.  The court tried to assuage Davis' concerns by asking how long Oronoz had practiced criminal law and whether he had ever been reversed for giving inappropriate legal advice on sentencing guidelines.  *Id*. at 6.  Counsel responded that he had been practicing since 1997, and had never had a reversal on this ground.  *Id*. Since Davis was insistent on going to trial on June 6th, the court asked Oronoz if he would be able to set aside accusations made by Davis and vigorously defend Davis at trial.  *Id.*  Oronoz answered "Yes, your Honor. I can.  *Id.*

To address Davis' concerns that the guideline calculations in the PSR were not accurate, the court also asked whether Oronoz had access to a consultant who could take a second look at the sentencing guideline calculation.  *Id*.  Mr. Oronoz indicated that he was aware of a consultant who used to do such work, but was unsure if the consultant still did so.  *Id*.  Nevertheless, Oronoz stated that he would happily have someone else look at the sentencing guideline calculation to

make sure he did not miss anything. *Id.* at 6–7. The court therefore authorized the defense to retain "an expert in the field of sentencing guideline calculations to provide a second opinion" and meet with both Oronoz and Davis to discuss his findings so that Davis could be satisfied with the calculations. *Id.* at 7.

Davis stated he believed his "calculation was right when Christina Silva was my US Attorney… because she put me at a category five… I mean offense level was 25 …." *Id.* at 7–8. However, the court informed Mr. Davis that the district judge would decide as a matter of law whether the calculations are correct. *Id.* at 8–9. The court also told Davis that any plea deal he enters into with the government is not binding on the court. *Id.* at 9.

Davis then indicated that he would "rather have a new attorney." *Id.* at 9–10. The following exchange occurred:

> THE COURT: You know, Mr. Davis, I've heard from you many, many, many times.
> THE DEFENDANT: Yeah.
> THE COURT: And you've been very critical of every lawyer that's ever represented you.
> THE DEFENDANT: Nah, but --
> THE COURT: Especially as close -- the closer you get to trial. And so I have ordered appointment of an expert to take a look at the guideline analysis, because that's your primary concern.
> THE DEFENDANT: Yeah.
> THE COURT: I am absolutely confident that Mr. Oronoz is a lawyer who has practiced for many, many years and is a specialist in criminal law, and is a professional who will set aside the fact that you have accused him of lying … and will vigorously represent you to the best of his ability. And so you are going to get your trial, you are going to get a second opinion on the guideline analysis, and you can consider what the second expert says. But I'm not going to appoint a new attorney a few days before trial.
> THE DEFENDANT: Okay.

*Id.* at 9:15–10:10.

Davis subsequently reiterated his wish to have a new lawyer appointed and inquired as to whether he could object to the undersigned's ruling:

> THE DEFENDANT: … I believe Jim is doing everything in his power to have me convicted. And I'm just keeping it all the way (indiscernible). So I would be able to object to that at trial; right? … On the grounds of ineffective assistance of counsel; right?
> THE COURT: Mr. Oronoz, you may file an objection to my order denying your motion to withdraw to preserve the record for Mr. Davis.

13

MR. ORONOZ: Okay.
THE DEFENDANT: All right.
MR. ORONOZ: I will.

*Id.* at 12:15–13:4.  *See* Davis' Appeal from the Magistrate Court's Order denying Counsel's Motion to Withdraw (ECF No. 244).

### III.   THE JUNE 6, 2016 TRIAL

On the morning of the trial, Monday, June 6th, the district judge heard from Oronoz and Davis regarding the Appeal of the order denying new counsel before bringing in the prospective jurors.  Day 1 Jury Selection Tr. (ECF No. 260) at 3–4.  The district judge stated that he had reviewed the record and denied the appeal.  *Id*.  The district judge conducted voir dire with the parties and selected a jury.  *Id*. at 6–83.

#### A.   Record Regarding Previous Plea Offers

After the jury was selected and sworn in, the district judge excused the jury and allowed counsel to make a record regarding the government's latest plea offers.  *Id*. at 83.  Before the trial, the government made Davis an offer that "contemplated essentially a 210-month sentence," which would have "limited his exposure significantly."  *Id*.  A prior offer was even more favorable with a guideline range of 168 to 210 months.  *Id*. at 84.  According to both government and defense counsel, Davis rejected those offers: "we are putting this on the record, Judge, so that if Mr. Davis is convicted, he won't then file some kind of appeal argument that his defense attorney never presented the offer to him."  *Id*. at 84–85.  Government counsel reported that the 210-month offer was open until the Monday morning of trial before the filing of the § 851 Notice, which increased the guideline range.  *Id*. at 84.

Davis told the district judge he did not know the offer was open until June 6 because he was told the offer expired over the previous weekend.  *Id*. at 84–85.  Had he known the offer was still open Monday morning, Davis stated that he would have taken it.  *Id*. at 85–86.

THE DEFENDANT: Your Honor, I didn't know. Over the weekend we were negotiating in some kinda --
THE COURT: But you rejected the offer on Friday. That's his point.
THE DEFENDANT: Yes. But I was under the impression, even Mr. [Smith], if I'm not mistaken, he was going to tell me -- because I was going to take an open plea

> this morning. He had to tell me what the time range was on it for me to even, like, hold on. I ain't no -- me and my attorney, we don't got that kind of communication like that. If I'd have knew that that offer was on the deal --
>
> THE COURT: It wasn't on the table. You rejected it on Friday.
>
> THE DEFENDANT: But I was basically --
>
> THE COURT: You rejected it on Friday; correct?
>
> THE DEFENDANT: No, we was trying to work out -- I never rejected it on Friday. We were trying to work out an open plea deal where they were going to drop one of the counts. But they came back and said that they boss or whatever wouldn't accept it, so that was last time I heard.

*Id.* at 86:6–25. Government counsel stated that Davis communicated his flat rejection of the 210-month offer through his counsel and presented a counteroffer, but the government was not willing to accept Davis' counteroffer. *Id.* at 86–88. Thus, the "communications and negotiations completely broke down," and the government prepared to try the case. *Id.* at 88:4–5. Mr. Oronoz requested a sealed ex parte hearing to address Mr. Davis' contentions outside of the presence of government counsel. *Id.* at 87–88.

### B.   *Ex Parte* Hearing Regarding Previous Plea Offers

Once government counsel left the courtroom, Oronoz told the district judge Davis' statement that he had no idea he was facing a 360-month possible sentence under an open plea was "categorically false." *Ex Parte* Hr'g Tr. (ECF No. 261) at 3. Oronoz stated that he and his co-counsel, Mr. Gaffney discussed the possibility with Davis and explained the ramifications of an open plea. *Id.* In response, Davis stated:

> Your Honor, I was under the impression that the government offered us an open plea deal on Friday, which I accepted. Then I called back to my attorney office at 3:00 that day. My attorney told me that they don't -- their boss don't want to go through with the deal, so all the deal is off. We going to trial. So I never was under the impression -- I never rejected the government offer. I was just under the impression that they didn't want to deal with me.

*Id.* at 4:8–16. Oronoz indicated his "understanding was that Mr. Davis absolutely categorically rejected a 168-month offer." *Id.* at 4:20–21. Mr. Gaffney attempted to recap the events surrounding the 168-month offer:

> MR. GAFFNEY: … There was a written plea agreement that was discussed with him that contemplated a 168-month sentence. What we were trying to do Friday was to go back to the government to try to get a few more concessions. The government rejected our proposal, and we were stuck with the one -- the original 168-month offer that was in writing in a plea agreement that we have. That's what was rejected by Mr. Davis. So --
>
> THE COURT: On Friday.

15

1

          MR. GAFFNEY: Correct.
          THE COURT: All right. Okay.

2   *Id*. at 5:8–18.  Davis told the district judge that he could not be faulted for not understanding

3   counsel's representations given the confusion with the offers; however, the district judge pointed

4   out that counsel disputed any confusion and asserted that Davis rejected the 168-month deal

5   outright.  *Id*. at 5–6.  Mr. Oronoz was then given leave of the court to ask government counsel if

6   they would renew the 168-month offer and the proceeding recessed.  *Id*.

7   **IV.   DAVIS' CHANGE OF PLEA**

8          When the proceeding resumed after lunch, outside of the presence of the jury, Oronoz told

9   the district judge that there was no plea deal.  Change of Plea Tr. (ECF No. 249) at 2.  Government

10  counsel reported that another offer was extended to Davis over the lunch hour, which would have

11  resulted in a 210 to 261-month guideline range.  Davis rejected that offer, but still wished to change

12  his plea from not guilty to guilty on all the three counts in the indictment:

13
14        MR. ORONOZ: … He's doing this to preserve his appellate rights as to the issues
          that --
15        THE COURT: Have been previously raised in the motions in limine and whatnot;
          right?
16        MR. ORONOZ: Correct. Suppression issues, et cetera, et cetera. And that is what
          he would like to do now.
17        THE COURT: All right. Is that correct, Mr. Davis?
18        THE DEFENDANT: Yes.
          THE COURT: All right.
19        THE DEFENDANT: Yes. Take a open plea.

20  *Id*. at 2:11–20.  Thus, Davis was sworn to tell the truth under the penalty of perjury.  *Id*. at 3.

21         The district judge proceeded with a plea colloquy in which Davis confirmed the following:

22     1)   he understood the charges against him;

23     2)   he reads, writes, and understands the English language;

24     3)   he intended to plead guilty to all three charges;

25     4)   he had not taken any drugs, medicine, or pills, or drunk any alcoholic beverages in the

26          past 24 hours that affected his ability to understand the court's questions or respond

27          appropriately to them;

28     5)   he had never been treated for any mental illness or addiction to drugs of any kind;

6)   he understood what was happening—he was pleading guilty to the indictment without a plea agreement;

7)   he had ample opportunity to discuss his case with his attorneys;

8)   he was satisfied with his attorneys "[f]or the time being";[7]

9)   he was entitled to have attorneys represent him at every stage of these proceedings;

10)  he was entitled to a trial by jury on the charges contained in the indictment;

11)  he understood that in order to convict him, all of the jurors would have to agree that he was guilty;

12)  he understood that he would be presumed innocent at trial and the government would have to overcome that presumption and prove him guilty beyond a reasonable doubt by competent evidence, and he would not have to prove he was innocent;

13)  he understood that the witnesses the government would rely upon at trial would have to come to court and testify in his presence, and his attorney could cross-examine those witnesses and object to any evidence offered by the government;

14)  he understood that his attorney would have the right to call witnesses and to present evidence on his behalf at trial;

15)  he understood he would have the right to choose either to testify at trial or not to do so;

16)  he understood that if the district judge accepted his guilty plea, he would be giving up his right to a jury trial and the district judge would simply enter a judgment of guilty and sentence him based on his guilty plea, and he was willing to do so;

17)  he understood that, by pleading guilty, he would waive his right not to testify against himself because the district judge needed to ask him questions about what he did in order to show that he was guilty as charged;

18)  he understood that, in order for the court to accept his guilty plea, he would have to admit that he committed the crimes charged in Counts 1, 2, and 3 of the indictment;

---

[7] Upon further questioning, Davis stated, "as long as we don't have any more differences, I'm fine with my attorneys." *Id*. at 7:22–23. Mr. Oronoz also stated that, despite their previous differences of opinion, "those have been overcome and addressed." *Id*. at 7:25–8:1.

19)  he had read a copy of the indictment;

20)  he discussed with his attorneys the charges to which he intended to plead guilty;

21)  he understood the elements of the offenses charged in the indictment and that the government would have to prove all of those elements to convict him;

22)  he recognized that the maximum statutory penalty under Count 1 would be 10 years, Count 2 would be 30 years, and Count 3 would be five years to life;

23)  he understood that a special assessment fee of $100 per count would be imposed at the time of sentencing;

24)  he understood that in every criminal case in which a defendant may be sentenced to over one year in prison, the court may also order a term of supervised release following imprisonment in addition to any maximum possible penalty;

25)  he understood that his supervised release could be imposed for a term of at least six years;

26)  he understood that while on supervised release, he would be required to abide by conditions specified by the court, and supervised release could be revoked if he violated any of those conditions;

27)  he understood that if supervised release was revoked for any reason, he may be sent to prison for the full term of supervised release without credit for time spent on post-release supervision;

28)  he understood that the combined time spent in prison, under a sentence of imprisonment, added to the time spent in prison if supervised release is revoked, could exceed the term of his original sentence;

29)  he understood that the offenses to which he was pleading guilty are felony offenses;

30)  he understood that the court may order him to make restitution to any victim of the offenses to which he was pleading guilty;

31)  he understood that, if his plea was accepted, he would be adjudged guilty of a felony, and that may deprive him of valuable civil rights, such as the right to vote, the right to serve on a jury, or the right to possess any kind of a firearm;

32)  no one had threatened him for forced him to plead guilty;

18

33) no one told him that, if he did not plead guilty, further charges would be brought against him, or some other adverse action would be taken against him;

34) he was not pleading guilty because of any coercion from or fear of codefendants;

35) no one made any promise to him that induced him to plead guilty;

36) he and his attorneys talked about how the sentencing commission guidelines might apply to the facts of his case;

37) his attorneys answered his questions about the sentencing commission guidelines to the best of their abilities;

38) he realized that the court would not be able to determine the guideline sentence for his case until after the presentence report has been completed;

39) he understood that after it is determined what guideline applies to his case, the district judge has the discretion to impose what the district judge considers to be a reasonable sentence, but that sentence may be in excess of a sentence called for by the guidelines;

40) he understood that if the sentence imposed by the court was in excess of a sentence called for by the guidelines, he would not have the right to withdraw his guilty plea;

41) he understood that under some circumstances and to the extent waiver did not apply, he or the government may have the right to appeal any sentence that the court imposed;

42) he understood that parole has been abolished, and if he is sentenced to prison, he will not be released on parole;

43) he understood that any of his relevant conduct, whether charged in the indictment or not, might still be considered in the presentence report and might increase the sentence to be imposed by the court, and if that were to happen, he would not have the right to withdraw his guilty plea; and

44) he understood the importance of the presentence report being complete and accurate.

*Id*. at 4–13, 17–30, 49.

### A.   Statutory Maximum Sentence

During the plea colloquy, questions arose regarding the maximum possible penalty for conviction of the three charges in the indictment.  Government counsel informed the court that the

statutory maximum sentence and fines had changed based on the § 851 Notice.  *Id*. at 13.  *See* Information & Notice Pursuant to 21 U.S.C. § 851(a) (ECF No. 243).  The government explained that a § 851 Notice places a defendant on notice that based on a prior felony drug conviction, the government the statutory maximum penalties for the defendant has increased, and Davis has such a conviction.  *Id*. at 16–17.  The maximum statutory penalties were stated on the record as follows: Count 1 – 10 years imprisonment and a $250,000 fine; Count 2 – 30 years imprisonment and a $2 million fine; Count 3 – life imprisonment and a $250,000 fine.  *Id*. at 13–14.

The district judge informed Davis that these were the maximums penalties set by statute, not by the sentencing guidelines, and the guidelines are typically less than the statute.  *Id*. at 14–15.  Davis initially expressed confusion regarding the difference between the statutory maximums and the sentencing guidelines as well as their interplay with a qualification as a career offender:

> THE COURT: And do you understand that I've never -- I don't think I've I ever seen guidelines -- the sentencing guidelines even approach some of those maximums.  I mean, so those -- that's the statutory maximum set -- it's set by statute, not by the sentencing guidelines that the courts follow. Do you understand?
>
> THE DEFENDANT: Yes. So you are saying that the courts don't got to follow the statutes?
>
> THE COURT: No. No. We have to follow the statutes, but the count -- for example, Count 2 is now 20 years. Is that right?
>
> MR. SMITH: No, sir, Judge. Count 2 is 30 years.
>
> THE COURT: 30 years. Okay. I'm sorry. Count 2 is 30 years. That's what the statute is, but the sentencing guidelines typically are less than the statute.
>
> MR. SMITH: Judge, just to make sure the defendant is entering a knowing plea, in this case, the guideline range will, in fact, be 30 years.
>
> THE DEFENDANT: What?
>
> THE COURT: You mean for all the charges?
>
> MR. SMITH: Yes. Because the parties -- the government believes -- and I don't think Mr. Oronoz is going to disagree -- that Mr. Davis qualifies as a career offender.
>
> MR. ORONOZ: Well, Judge, we dispute that.
>
> THE COURT: Well, and so we will get to that at sentencing.
>
> MR. ORONOZ: Yes. That is something --
>
> THE COURT: That's a separate issue. I am not going to go into that today.

*Id*. at 14:9–15:16. Additionally, the government clarified that the "maximum penalty for violation of Section 924(c) is life.  Regardless of whether or not [Davis is] a career offender, it's life."  *Id*. at 18:9–11.  Davis stated he was "kind of confused" after the district judge and the government's explanations.  *Id* at 18.  Mr. Oronoz requested a brief break to confer with his client.  *Id*.  The

proceeding recessed for eight minutes.  *Id.* at 18:22 (court recessed at 1:48 p.m. and resumed at 1:56 p.m.).  When the court was back in session, Davis was asked again about the statutory maximums:

> THE COURT: All right. You recognize the maximum statutory penalty under Count 1 would be 10 years, Count 2 would be 30 years, and Count 3 would be five years to life. Do you understand that?
> THE DEFENDANT: Yes.

*Id.* at 19:6–10.  Given Davis' affirmative response, the district judge continued with the plea colloquy.

With regard to Count 3, the government asked the district judge to canvas Davis regarding the statutory requirement of a consecutive sentence.  *Id.* at 27.  Davis was asked if he understood the federal statute mandates that whatever sentence is imposed on the 924(c) count must run consecutive to every other sentence.  *Id.* at 28.  Davis asked if he had to agree.  *Id.*  The district judge told Davis he did not have to agree—a consecutive sentence was mandated in the statute. *Id.*  Davis asked what was the meaning of "consecutive":

> THE DEFENDANT: So, what you mean by consecutive --
> THE COURT: It has to follow it.
> THE DEFENDANT: So if you impose one sentence --
> THE COURT: Well, no.  I will impose a sentence of something, you know, some term of years. But if you break it down by counts, you know, Count 1, Count 2, Count 3, Count 3 has to be in addition to the sentence for the other two counts.
> MR. SMITH: And, Judge, for the record, it also has to be in addition to whatever sentence he may receive in state court, because by statute it has to run consecutive.
> THE DEFENDANT: Well, Your Honor, my state case is totally different. I'm worried about my federal case right now, so --
> MR. SMITH: And, Judge, I understand that, but he needs to acknowledge, in order for this to be a knowing and voluntary plea, that that sentence has to be consecutive to any other sentence period, state or federal.
> THE COURT: … [Do] you understand what Mr. Smith is saying?  It's consecutive. It has to be consecutive to any -- to any sentence on the other counts, and, also, he says, on the state charge.

*Id.* at 28:7–29:9. Davis stated that his state case had not started yet and he inquired about whether his state sentence could run "concurrent" to his federal sentence.  *Id.* at 29:10–12 ("So if the state judge want to run my state sentence concurrent with my fed time, that's -- ain't that their business?").  The district judge responded, "[t]hat's what the statute says.  Let me just answer your

question that way.  That's what the statute says." *Id*. at 29:19–20.  To further respond to Davis'

question, government counsel stated that "the state court cannot order its case to run current with

the -- whatever sentence the Court imposes on the 924(c) count, because by statute, it has to run

consecutive to every other sentence." *Id*. at 29:25–30:3.

> MR. SMITH: And, if Mr. Davis does not acknowledge that, then unfortunately it's not going to be a knowing and voluntary plea.  He has to acknowledge that he realizes that.
> THE COURT: Okay.  You understand?  It's got to be consecutive then.
> THE DEFENDANT: But the state running time concurrent with fed time all the time.
> THE COURT: But it has to be consecutive.  The statute says it has to be consecutive.  Do you understand that?
> THE DEFENDANT: Yes, I guess.
> THE COURT: All right.  All right.

*Id*. at 30:4–14.  Based on Davis' affirmative response, the colloquy continued.

### B.      Factual Basis for Davis' Plea

The district judge inquired as to the factual basis for Davis' guilty plea.  The government

initially provided a summary of the evidence against Davis.  *Id*. at 30–32.  However, Mr. Davis

indicated he did not agree with all the evidence stated by the government because the summary

included allegations regarding a robbery, which was not part of the allegations in the indictment.

*Id*. at 32–33.  The government confirmed that Davis was not charged with or pleading guilty to a

robbery in this case, and Davis confirmed that he agreed with the government's statement of

evidence excluding the robbery:

> THE COURT: … I wasn't sure on the robbery part.
> MR. ORONOZ: Well, yeah.  That's a separate issue, Judge, and he's not pleading to that.
> THE DEFENDANT: He keep -- I'm getting confused when he keeps saying robbery and --
> THE COURT: All right.
> THE DEFENDANT: -- or mentioning the state case.
> THE COURT: The robbery part is out.
> MR. ORONOZ: He's just pleading to the three counts here, Judge.
> THE COURT: Yeah. Is that right, Mr. Smith?  That's not something he's pleading guilty to.
> MR. SMITH: The robbery is unrelated, but the reason why the police were at Mr. Davis's house in the first place was pursuant to that robbery investigation.
> THE COURT: I understand.  That was an investigation.  All right. So the robbery -- you aren't pleading guilty to the robbery.  All right.  Do you think that confused

1  you?  It confused me.  All right?
   THE DEFENDANT: Yes.
2  THE COURT: Okay.  Now, do you agree with the statement of the government's
   evidence against you about what you did?
3  THE DEFENDANT: Yes.

4  *Id.* at 33:1–25.

5      The district judge proceeded to ask Davis how he wanted to plead for each count in the

6  indictment.  *Id.* at 34.  Davis expressed reservation, "I got to plead to them guilty, I guess," and

7  asked to speak to his counsel.  *Id.* at 34:6–16.  Davis and Oronoz had a brief discussion off the

8  record.  *Id.* at 34:18–19.  Davis then asked the district judge about the particulars of his plea:

9      THE DEFENDANT: … I want to know is it no contest, or do I got to plead just flat
        out guilty?
10     THE COURT: You got to plead flat out guilty.
        THE DEFENDANT: Okay.  Then I will say guilty.
11     THE COURT: All right.  Are you pleading guilty because in truth and fact you are
        guilty and for no other reason?
12     THE DEFENDANT: I am pleading guilty, because I believe if I was to go to trial,
        I would be found guilty.
13     THE COURT: All right.  Are you pleading guilty because in truth and fact you are
        guilty?
14     THE DEFENDANT: To Count 1 and 2 probably, yes.  But Count 3, I'm just going
15     to plead guilty to it, because I don't want to go to trial and lose.  Because I feel like
        I could be --
16     THE COURT: Mr. Oronoz.
        MR. ORONOZ: Your Honor, essentially, I think he's ready to admit to Count 1 and
17     2, but what he's trying to do is, I guess, plead by way of Alford to Count 3. And --
18     MR. SMITH: Judge, unfortunately, he has to admit he's guilty to Count 3.
        THE COURT: Yeah.
19     THE DEFENDANT: Yeah. That's what I was saying.  Like, Count 2 -- 1 and 2. 3
        -- I'll just say guilty.
20     THE COURT: Guilty to Count 3 as well?
21     THE DEFENDANT: I just said Count 1, 2 and 3, I'm guilty.
        THE COURT: Guilty to Counts 1, 2, and 3.  Correct?
22     THE DEFENDANT: Yes.

23 *Id.* at 35:3–36:6. The government confirmed that Davis' statements were sufficient.  *Id.*  36:7–9.

24     The district judge conditionally accepted the guilty plea because Davis acknowledged that

25 he was, in fact, guilty as charged in the indictment, he knew about his right to trial, what the

26 maximum possible penalty could be imposed, and he confirmed that he was voluntarily pleading

27 guilty.  *Id.* at 36:10–14.  The district judge found Davis "fully competent and capable of entering

28 an informed plea, and that his plea is a knowing and voluntary plea supported by an independent

23

1    basis in fact containing the essential elements of the offense charged." *Id*. at 36:17–20.

2           Davis again expressed confusion and asked the district judge more questions about his plea:

3           THE DEFENDANT: Yes. Your Honor, can I ask you on an open plea, was I
            supposed to -- what is it?  I thought it was like I'm only agreeing to open plea to
4           not go to trial. I'm -- and I ain't entered, like --

            THE COURT: Well, you have to plead guilty in order not to go to trial. I mean, the
5           jury is here. We are ready to go to trial. So you have got -- you are pleading guilty
            to Counts 1, 2, and 3.

6           THE DEFENDANT: But now I'm kind of confused. I think I just did something
            wrong. If I just agreed to with the government -- I ain't just agree with nothing the
7           government had to do with that plea, did I?

8    *Id*. at 37:11–22.  Mr. Oronoz attempted to explain that Davis was "very rattled," and "a little upset"

9    at that moment.  *Id*. at 37:23–25.  But Davis denied that characterization, "[n]o I'm not upset. I'm

10   just confused."  *Id*. at 38:1–2.  Both counsel and the district judge stated that the trial should

11   proceed if Davis was confused about the guilty plea:

12          MR. ORONOZ: If he's not -- if there's not -- if he's not clear on the plea, I think
            the trial should proceed. But --
13          THE COURT: Yeah. I mean, that's the way it's got to go.

14          MR. ORONOZ: Yeah.
            THE DEFENDANT: Because now I just want to know, because I thought an open
15          plea is I'm not agreeing to anything that the US Attorney --

            THE COURT: No.
16          THE DEFENDANT: -- is saying?

17          THE COURT: No, you are pleading guilty to the -- to the indictment.
            MR. ORONOZ: Correct, Your Honor.
18          THE DEFENDANT: That's what I was saying. I want to plead guilty to the
            indictment, but then I noticed that they were reading things out of their own guilty
19          plea. And I want to know if --
            THE COURT: But that's what -- those are the allegations of the indictment though.
20

21   *Id*. at 38:3–22.  To clarify Davis' confusion regarding the factual basis for his plea, the government

22   asked the district judge to canvas Davis.  *Id*. at 39.  Government counsel stated, "he has to make

23   an admission that supports the Court finding that there was a factual basis for the plea, which the

24   government's fine with.  We don't care how we get there, just as long as we get there."  *Id*. at

25   39:14–17.  Davis agreed to answer the district judge's questions about what he did in July 2012

26   that caused him to plead guilty.  *Id*. at 39:19–25.

27          Davis admitted that the police pulled him over in a traffic stop and told him they had a

28   search warrant for his house.  *Id*. at 40:16–17.  During the traffic stop, the police found marijuana

                                                    24

on Davis' person. *Id*. at 40:22–41:3. When they searched Davis' house, the police found ammunition and cocaine. *Id*. at 41:5–9. The police also found a gun. *Id*. at 40–41.[8] Davis further admitted that he "possessed the cocaine to smoke with [his] friends." *Id*. at 41:18–19. The court asked whether Davis would "distribute" the cocaine to his friends when they came over. *Id*. at 41:20–24. Davis seemed to take issue with the word "distribute":

> THE DEFENDANT: I didn't sell it to them. We just smoked it.
> THE COURT: I didn't say you sold it to them. You distributed it to them. You gave it to them; right?
> THE DEFENDANT: Yes, we all smoked it together.

*Id*. at 41:25–42:4. Davis also asked, "[l]ike doing drugs, that's like distribution?" *Id*. at 45:4–5. The district judge said, "[s]moking it with your friends, that was distribution. You distributed the cocaine to them." *Id*. at 45:6–8.

The canvas continued to Davis' possession of a firearm in furtherance of a drug trafficking crime. *Id*. at 42–49. Davis initially denied using a gun for any drug related purpose:

> THE DEFENDANT: I ain't used no gun.
> THE COURT: No, but that's why you had the gun; correct?
> THE DEFENDANT: No, I didn't have it for no drugs.  I had the gun just for -- under my pillow for protection.
> THE COURT: For protection in connection with the drug trafficking that you were doing with your friends?
> THE DEFENDANT: We only had $100 worth of cocaine.  I don't think you need a gun to protect $100 worth of cocaine.  … [T]he gun was for, like, to protect my home just in case somebody was to, like, break in or something like that.  Just basically for protection reasons.  … It wasn't to protect the drugs.  It was to protect the home.
> …
> THE COURT: I understand that.  But the drugs were in the house; right?
> THE DEFENDANT: Yes.  The drugs was in the house.
> THE COURT: And you had the gun to protect the stuff that was in the house?
> THE DEFENDANT: Well, not the cocaine.  It was my life.
> THE COURT: So it was everything but -- you had the gun to protect everything else but not the cocaine?  Is that what you are saying?
> THE DEFENDANT: It was to protect my life just in case I was home and somebody was to break in or try to harm me while I was in my home.  But it wasn't for --

---

[8]  It is unclear from the colloquy whether the police discovered the gun on Davis' person or in his house; however, Davis confirmed multiple times that he possessed and the police found his gun. *Id*. at 40–41. During the evidentiary hearing, Davis indicated the gun was found in his house.  Evid. Hr'g Tr. (ECF No. 278) at 63.

1  THE COURT: Or to take something from your home?
2  THE DEFENDANT: Yes, like my TV or belongings.
   THE COURT: That's right.
3  THE DEFENDANT: But the cocaine -- it was basically for protection reasons.  I'm
   just telling you what it was for.

4  *Id*. at 42:9–44:6.

5      The government asserted that there was no factual basis for the plea if Davis was not willing

6  to admit that he possessed the firearm to protect himself while he was engaged in distributing

7  cocaine to his friends.  *Id*. at 44:12–22.  The district judge agreed and informed Davis that, for his

8  plea to be accepted, Davis would have to admit that he used the gun in connection with the

9  distribution of the cocaine—not that the drugs were the only reason for having the gun, but that

10 the drugs were a large part of the reason for having the gun.  *Id*. at 45:1–11.  Still unsure about the

11 wording, Davis stated that he would "just agree to whatever the statute says is -- like if they charged

12 it that way, then I agree with it."  *Id*. at 45:20–22.

13     The government contended that Davis' statement was not sufficient because counsel was

14 not sure what he agreed to.  *Id*. at 46:10–14.  Davis repeated that he "just agreed to the statute."

15 *Id*. at 46:24. "Whatever I was charged with. If that's what they charged me with, I agree."  *Id*. at

16 46:25–47:1. Government counsel noted, "it sounds like he's just agreeing that the statute is written

17 correctly, but he's not -- we don't know factually what he's agreeing to.  … That's just not going

18 to work."  *Id*. at 47:2–10.  To create a sufficient factual basis for the plea that Davis could agree

19 with, government counsel read part of the indictment into the record:

20     MR. SMITH: Count 3, Judge, for the record -- I apologize.  Let's just try it this
       way.  [Count 3] says that Mr. Davis possessed a Browning Arms Mark .22 caliber
21     pistol with serial number 655NM12014 in furtherance of a drug trafficking crime;
       to wit, possession of cocaine with intent to distribute as charged in Count 2 of the
22     indictment.
       THE COURT: Is that correct?
23     THE DEFENDANT: That's correct.
       THE COURT: Do you agree with that?  You plead guilty to that; correct?
24     THE DEFENDANT: Yes, I'm pleading guilty to --
       MR. SMITH: Judge, we think that's sufficient.
25     THE COURT: All right. All right.  …
26

27 *Id*. at 48:18–49:5. Based on these stipulated facts, the district judge accepted Davis' guilty plea,

28 dismissed the jury, and vacated the trial.  *See* Mins. of Proceedings (ECF No. 245).

26

V.    THE EVIDENTIARY HEARING

Approximately two weeks after the district judge accepted Davis' guilty plea, Davis filed his eleventh Motion to Dismiss Counsel (ECF No. 251).  Mr. Oronoz filed a Motion for Joinder (ECF No. 252).  Two weeks after that, Davis filed a pro se Motion to Withdraw Guilty Plea (ECF No. 255).  On July 19, 2016, the court held a hearing on the Motion to Dismiss Counsel (ECF No. 251).  The court granted the motion and appointed new counsel, Mr. Stolworthy.  Mins. of Proceedings (ECF No. 259).  Stolworthy filed a second Motion to Withdraw Guilty Plea (ECF No. 264), and the court set the matter for an evidentiary hearing on September 20, 2016.  *See* Min. Order (ECF No. 268).  During the evidentiary hearing, Davis and Oronoz testified regarding the alleged breakdown in their attorney-client relationship.

A.    **Davis' Testimony**

Mr. Davis testified that he did not know he would have to explain any questions to the court in order to plead guilty.  Sept. 20, 2016 Evid. Hr'g Tr. (ECF No. 278) at 10.  He thought he was pleading guilty to the indictment and that was it.  *Id*.  Davis stated that he did not know what a § 851 Notice was before June 6, but he was told before the trial that it would enhance his potential sentence by 10 years.  *Id*. at 12–13.  Oronoz told him they did not need to worry about the § 851 Notice because the government would have to prove he was eligible for the sentencing enhancement.  *Id*. at 13:18–23.  Therefore, Davis was confused and did not understand that the § 851 Notice would increase the maximum possible penalties to 30 years imprisonment for Count 2 of the indictment.  *Id*. at 14.

With regard to the factual basis for the plea, Davis testified that Oronoz "told me just to plead guilty, and we going to -- we going to challenge everything in the Ninth Circuit."  *Id*. at 20:5–6.  Davis stated that he did not admit he was guilty of Count 3; rather, he pled guilty only because he believed Oronoz was not prepared for trial, he would be found guilty anyway, and he wanted to avoid more severe penalties for being found guilty by a jury.  *Id*. at 21, 33–34.  Davis said that Oronoz refused to present witnesses who were arrested with him and would have testified that they all purchased the cocaine together.  *Id*. at 30.  In his mind, Davis never admitted that he possessed the gun in furtherance of a drug crime because he had the gun to protect the home and

his belongings, not the drugs.  *Id*. at 31–32.  Davis testified that he just began to agree with whatever the statute said because he became so confused by having to answer questions.  *Id*. at 32. He "wasn't agreeing to the facts," he was just agreeing to whatever the indictment said to prevent the trial from going forward.  *Id*. at 33, 35.

Davis testified that he felt like he had done something wrong during the plea colloquy because the district judge "allowed the government to turn a non-conditional plea into a conditional plea, and my attorney just stood back and let it happen without objections or anything."  *Id*. at 22:22–23:12.  By "conditional plea," Davis explained he meant that he had to agree to facts to support the plea:

> I had to stipulate to six years supervised release. I had to stipulate to some notice that I never even got a chance to really review with my attorney. I had to stipulate to -- what you say -- consecutive time, running consecutive with my state sentence, which my state sentence had nothing to do with my federal case.
>
> I -- I feel like I had to stipulate to a lot of things in order for the Court to accept this plea. So that's why I was saying I feel like this -- I did something wrong. I just took -- I just turned a non-conditional plea into a conditional plea.

*Id*. at 23:15–24.  Davis also stated that he was confused during the change of plea:

> I was just confused. I was really trying to figure out what was going on, because there was too much going on at one time. I had the Judge talking to me. I had Phillip Smith talking. Everybody was talking at -- like, it was coming from all directions. So I was very confused. So I didn't necessarily know what was really going on. I wasn't upset. I wasn't rattled or anything like that. I was just -- I just want to know what was really going on. I was confused. And my attorney didn't even -- he just wouldn't tell me, and, like, he wouldn't object or pull me to the side, like. All the time he pull me to the side was basically just say, "Just agree to it. Just agree to it." So I was kind of confused.

*Id*. at 25:18–26.

On cross examination, Davis further explained that he did not want to agree to any facts the government set forth but he did want to plead guilty to the indictment.  *Id*. at 62.  He actually wanted to plead no contest, but was told that he had to plead "flat out guilty."  *Id*.  Davis agreed that: (1) a gun was found in his house, (2) the gun belonged to him, (3) he had the gun for protection, (4) he possessed cocaine, (5) he gave the cocaine to his friends and they smoked it together, and (6) he possessed the gun in conjunction with drug trafficking.  *Id*. at 63–65.  In addition, the government read the factual allegations underlying Count 3 and Davis agreed that they were correct.  *Id*. at 66 (citing Change of Plea Tr. (ECF No. 249) at 48–49).  Nevertheless,

Davis insisted that he just started agreeing to everything because there were so many questions. *Id.* at 66, 75–76.  Davis acknowledged that he brought up a lot of questions to the district judge but stated that when Oronoz asked for the court's indulgence to discuss his questions, Oronoz told him not to worry because they would challenge the issue on appeal.  *Id.* at 66–68, 76.  He said those brief consultations did not give him enough time to "fully understand." *Id.* at 67.  Davis just agreed because he saw "everybody in the courtroom basically getting fed up" with him asking too many questions.  *Id.* at 76.

Davis also testified that, at times, the district judge could not or would not answer his questions, and it contributed to his confusion:

> A. … at times, even the courts couldn't even answer my questions.  They -- they refused.  Like -- even, like, you read through it, the Judge would even said: "I'm not fully -- I'm not willing to go there right now," or he would say that -- that he never seen statutes this high.  He -- he would say things like that to where even it made me confused as, like, what was really going on.  So, if the Judge didn't even see statutes this high, or he was -- he wasn't prepared to answer certain things for us, like the state or the career offender, he was like, "We'll get to it at sentencing," of course I'm going to become confused.  …  So most of my questions that I was really trying to answer, the Judge, he couldn't answer hisself.
> Q. So the Judge didn't know the answers to your questions --
> A. He said they --
> Q. -- is that your testimony?
> A. -- don't nobody understand the guidelines and things like that.  I don't think nobody does.  You need a roadmap to get -- when you say things like that, I become confused.  …  I don't -- I don't know nothing about the federal rule of law like that, so --  … like I say, he -- he explained what -- what the guidelines was and things like that.  But then he also said that don't nobody understand the guidelines.  So it becomes confusing.  It's con- -- it's like a conflict.  So it's kind of conflicting.

*Id.* at 68:13–69:21.

Concerning the prior plea offers, Davis testified that he did not believe his counsel made any counteroffers, he was under the impression that all offers were made by the government.  *Id.* at 37.  Oronoz did not communicate any deadlines to Davis on any offer, except for one offer in March 2016 by the previous government counsel, and he turned down that offer because he didn't know where he was at on the guideline.  *Id.* at 37–38.  However, Davis stated that he probably would not have taken any offer without first receiving the help of a consultant.  *Id.* at 38.  On cross-examination, Davis testified he understood that no more plea offers would be made after the trial started and he did not know that Oronoz approached the government after jury selection to see

whether the case could be resolved.  *Id*. at 41.

Davis said the fact that he was unable to meet with a sentencing consultant or understand the sentencing guidelines played a big role in his decision to change his plea to guilty.  *Id*. at 22. If he had met with a sentencing consultant, Davis said he would have known exactly where he was at on the guideline and known if he "was getting the appropriate type of deal within the sentencing guideline."  *Id*. at 22:8–13.

With regard to the sentencing guidelines, Davis testified that he told the district judge he was confused during the plea colloquy because he did not know where he was at on the guideline. *Id*. at 15.  Davis stated that he never got the sentencing consultant that was approved during the May 27, 2016 hearing.  *Id*.  Oronoz told Davis that all the consultants were out of town and he would have to wait until after the June 6th trial date to meet with a consultant.  *Id*. at 15–16.  Davis said he needed the consultant before trial in case the government was to offer a deal, he would know if it was an appropriate deal or not.  *Id*. at 16.  When asked whether Oronoz actually sat down with him without a sentencing consultant and tried to figure out where he was on the guideline or talk to him about the guidelines, Davis testified that Oronoz did not.  *Id*. at 16–17. "He never told me anything.  All he told me is 'I know a good deal when I see a good deal.  You need to take it'."  *Id*. at 16:25–17:2. Although he stated that Oronoz showed him the sentencing guideline table, Davis said Oronoz never went over it with him.  *Id*. at 17.  "[H]e showed it to me, but he never sat down and actually went over it with me."  *Id*. at 17:11–12.

Davis also testified he did not know what the word "consecutive" meant.  *Id*. at 18.  He stated that he was not familiar with the word and the trial was the first time he had heard the word: "To my knowledge.  I never heard -- I never had a crime -- I never committed a crime or had an offense where I got consecutive time, if I'm not mistaken."  *Id*. at 18:11–17.  Therefore, he did not understand the concept.  *Id*. at 18.  However, on cross-examination, Davis testified:

> Q. "So if the state judge wants to run my sentence concurrent with my federal time, that's -- ain't that their business?"  So you understood the difference between concurrent versus consecutive; right?
> A. Yeah. I know what concurrent mean.
> Q. And you also knew -- because you understood what the word concurrent meant, you understood that there was the possibility that it could be run consecutively, and that in fact it had to be.  Correct?

A. See, what you -- what you -- what you not asking is did I understand that Count 3 is to be ran consecutive with any crime.  I never was told that it was run consecutive.  I didn't even know what the hell they were talking about.

*Id*. at 53:7–19.  Davis stated he was confused about a consecutive sentence because the district judge was confused and did not know that a state sentence would have to run consecutive to a federal sentence.  *Id*. at 55:24–56:2. He said the government did not tell anyone about the requirement of a consecutive sentence before June 6th, "we was all blindsided, from my attorneys were blindsided.  The Judge was blindsided. I -- it made the whole plea confusing."  *Id*. at 56:4–6.  When asked whether he understood that Count 3 had to run consecutively based on what was explained to him during the colloquy, Davis stated he "understood the way how the statute was written up."  *Id*. at 72:6–9.

On cross-examination, the government asked Davis about his statement to the district judge that he understood the maximum statutory penalties.  *Id*. at 43–49.  Davis testified that Oronoz did not discuss the possibility of a life sentence with him; rather, they discussed the issue of Davis being a career offender.  *Id*. at 49–51.  Based on the transcript, however, Davis agreed that government counsel clarified that the career offender statute would not affect the statutory maximum penalties, although he said "it wasn't registering, because we were talking about this career offender thing."  *Id*. at 49–50.  If he would have known the maximum penalties would be "30 years for each count," Davis said "there would never have been a plea."  *Id*. at 70:17–19.  Although Davis acknowledged that the district judge explained the maximum penalties, he said they were not explained until "after the plea was already underway."  *Id*. at 70–71.

Davis admitted that he was aware of and reviewed the PSR, which stated his potential sentence, qualification as a career offender, and a calculation of his criminal history points.  *Id*. at 57–58.  However, Davis testified that he was not aware on June 6 that he could be determined to be a career offender because he did not believe or agree with anything in the PSR, and that was the reason a sentencing consultant was approved.  *Id*. at 59.  Thus, he was aware of the PSR's contents, but he believed the report was inaccurate and he wanted an accurate calculation.  *Id*. at 59–60, 71.  Additionally, Davis stated that preserving the right to challenge the career offender designation had nothing to do with his desire to enter an "open plea."  *Id*. at 60.  He pled guilty

because he believed his attorneys were not prepared for trial and he wanted to save himself "from trial enhancement points." *Id*. at 60–61. When asked whether it was correct that he pleaded guilty not because Oronoz or anyone else forced him to do so, Davis further explained:

> I had no choice but to plead guilty, because if I would have went to trial with no defense, no witnesses, for which I was under the impression that we was going to have certain witnesses, which we didn't, I knew I was going get found guilty. Because if you looked at the jury panel, there's no way that I was going to gamble with that jury panel with -- with no defense.

*Id*. at 73:9–15. After considering his defenses and Oronoz's prediction that the jury would find him guilty, he took Oronoz's advice and "just took the open plea":

> but it wasn't no willingly open plea. I didn't really want to. If I had a defense, ain't no way in the world we would have been sitting here today. We'd have been probably at sentencing or I could have actually won certain counts, whatever. We never know what would have happened if I'd had actually had a defense.

*Id*. at 73–74.

## B.    Oronoz's Testimony

Oronoz testified that he felt Davis understood the maximum sentence discussion even though there was some degree of confusion regarding the § 851 Notice. *Id*. at 91:2–7. Counsel requested that a pre-plea PSR be prepared after Davis first expressed disagreement with his likely designation as a career offender. *Id*. at 96. However, Davis was always fairly adamant that the career offender designation did not apply to him. *Id*. Oronoz's impression was that Davis was simply unhappy and did not want to accept the fact that in all likelihood he would be a career offender if he was found guilty at trial. *Id*.

When Oronoz was asked whether he believed that Davis was having trouble comprehending or understanding the sentencing guidelines, Oronoz stated that Davis "was having trouble agreeing with our interpretation of the guidelines and what we conveyed to him as the result of our preparation on the case. He -- he adamantly disagreed with our calculations." *Id*. at 82:17–20. Oronoz did not recall Davis needing additional explanation, he simply disagreed with counsel's analysis, and they reached an impasse on the issue. *Id*. at 82–84.

Mr. Oronoz acknowledged the approval of a sentencing consultant to provide Davis a second opinion on the calculations, but counsel experienced great difficulty finding a consultant and was unable to do so before the scheduled trial date. *Id*. at 83–85, 102–03. Oronoz said he was

"in a tough spot" because the trial had already been continued multiple times, the court approved an expenditure for a sentencing consultant but counsel could not secure one before June 6, and Davis insisted on going to trial. *Id*. at 103. Additionally, Oronoz noted he "was convinced that the sentencing consultant was going to absolutely corroborate" counsel's position on the calculations. *Id*. at 103–04. Given the alternatives, Oronoz complied with his client's wishes and maintained the trial date. *Id*. at 103.

With regarding to the § 851 Notice, Oronoz testified he believed Davis had some degree of confusion about how the Notice affected his possible sentence. *Id*. at 86. Although Oronoz stated they knew "a life sentence was always possible here," he acknowledged that the § 851 Notice was "sprung" on him that morning of the trial. *Id*. at 87–88. Oronoz said the Notice was "certainly new" to Davis, but counsel discussed the Notice with Davis and he seemed to process it, although he "certainly didn't like it." *Id*. at 88. "I can't say he didn't understand it. I just don't think he liked it." *Id*. at 88:23–24. On cross-examination, Oronoz confirmed that government counsel told him the only practical effect of the § 851 Notice was an increase of the statutory maximum for the drug offense from 20 to 30 years. *Id*. at 96. Prior to the plea colloquy, Oronoz discussed that practical effect with Davis, who was "extremely" unhappy with the increase. *Id*. at 97. Nevertheless, Oronoz felt that Davis understood the practical effect of the § 851 Notice. *Id*.

Oronoz acknowledged that "it was certainly a difficult plea," but stated he would not have continued if he felt that Davis did not understand the consequences of the plea. *Id*. at 89. When asked whether he was concerned that Davis indicated he did not know where he was at on the sentencing guidelines during the plea, Oronoz testified that Davis' statement did cause concern but he knew that they had "discussed it ad nauseam." *Id*. at 90. Oronoz recalled suggesting at one point in the colloquy that Davis proceed with the trial. *Id*. at 91. Rather than perceiving Davis as not comprehending the situation, Oronoz testified that he felt like Davis "was hedging and -- and saying that he didn't understand things that we discussed and that we clearly had gone over." *Id*. at 91:24–92:3. So although Oronoz was concerned about Davis' multiple statements indicating confusion, going to trial was "the preferred alternative" if Davis did not want to go through with the plea. *Id*. at 92:4–12. Oronoz posited that Davis did not want to accept the reality of the

situation he was in.  *Id*. at 92.  On cross-examination, Oronoz confirmed that the plea colloquy was paused at one point when Davis stated that he was confused, and Davis, Oronoz, and Gaffney were given time to privately confer about the proceedings.  *Id*. at 97–98.

With regard to the plea offers before trial, Oronoz said that he had a lot of discussions with government counsel about the offers, including presenting counteroffers.  *Id*. at 93.  Oronoz testified that he communicated to Davis every plea offer the government presented and tried to explain the benefits and downsides.  *Id*. at 93, 103.  Davis "made a number of counteroffers."  *Id*. at 93.  Oronoz recalled that the 168–210 month offer expired because Davis said he did not want it, not because Oronoz failed to present a counteroffer.  *Id*. at 92–93.  Davis categorically told Oronoz "he didn't want the 168," and Oronoz called government counsel and explained that to them.  *Id*. at 93.  In addition, Davis rejected the 210-month offer that the government made after the § 851 Notice was filed on the morning of trial.  *Id*.

On cross-examination, Oronoz agreed that some of the plea offers were made in writing and a written plea offer routinely contains the statutory maximum penalties for the offenses to which the defendant may plead guilty.  *Id*. at 98.  Oronoz testified that Davis would simply reject the statutory maximum penalties as incorrect, "he'd understand the reality of the situation, and he simply rejected it."  *Id*. at 99.  Oronoz confirmed that Davis' handwritten letter to Judge Mahan, dated May 18, 2016, attached a letter from counsel explaining that Davis faced a guideline range of 360 months to life if he went to trial.  *Id*. (citing Letter (ECF No. 225)).

On redirect, Oronoz stated that he and Davis had "a number of arguments."  *Id*. at 105.  Oronoz was asked whether he told Davis he was going to snap Davis' neck if Davis did not take a plea, Oronoz testified that Davis threatened *him* with bodily harm and Oronoz explained the following to Davis:

> A. …  I said, "Look. You know, you're not -- I'm not going to be your punching bag until the marshals get over here. I'm going to defend myself. And I don't want to do that. I suggest we be respectful. I suggest we be totally -- totally professional. But don't think for one second you're going to be able to hit me, and I'm just going to stand there and take your pummeling.

*Id*. at 106.  Oronoz did not recall verbatim exactly what was said, but Davis' tenor was "clearly threatening" and Oronoz forcefully conveyed that Davis should not follow through with his threat.

1   *Id.*  The threat was made over the phone and Mr. Gaffney was also present for the call.  *Id.*  at 107.

2   Oronoz was also asked whether he told Davis he would ensure Davis was convicted:

3   > Q. Did you ever say you were going to make sure he was convicted as a result of
    > that heated argument?

4   > A. Absolutely not.

    > Q. Okay.

5   > A. Never.

6   *Id.*

7          After this testimony, counsel for Davis requested and received a subpoena duces tecum to

8   obtain any audio recordings of conversations between Davis and former counsel occurring

9   between May 27 and June 16, 2016 from the detention facility.  Order (ECF No. 275); Subpoenas

10  (ECF Nos. 276, 282).   The Southern Nevada Detention Center eventually responded to the

11  subpoena providing eight audio files relating to eight phone conversations.  *See* Notice (ECF

12  No. 291).   Counsel for Davis filed a supplemental brief (ECF No. 292) stating that "the actual

13  substance of the phone calls were not recorded due to the applicability of the attorney-client

14  privilege."  *Id.* at 2:20–21.

15                                    **DISCUSSION**

16  **I.    LEGAL STANDARD**

17         When a district court has accepted a guilty plea, but not yet imposed a sentence, the court

18  has discretion to permit the defendant to withdraw his guilty plea for a fair and just reason that did

19  not exist when the defendant entered his plea.  Fed. R. Crim. P. 11(d)(2)(B); *United States v.*

20  *Mayweather*, 634 F.3d 498, 506 (9th Cir. 2010) (Rule 11(d)(2)(B) does not embrace

21  "circumstances known to a defendant at the time of the guilty plea").  Although the defendant

22  bears the burden of establishing a fair and just reason, "the 'fair and just' standard is applied

23  liberally."  *United States v. Yamashiro*, 788 F.3d 1231, 1237 (9th Cir. 2015) (citing *United States*

24  *v. Bonilla*, 637 F.3d 980, 983 (9th Cir. 2011)).

25         "It is well-established that a defendant has no right to withdraw his guilty plea, and that a

26  withdrawal motion is committed to the sound discretion of the district court."  *United States v.*

27  *Signori*, 844 F.2d 635, 637 (9th Cir. 1988) (collecting cases); *Yamashiro*, 788 F.3d at 1236 ("The

28  decision whether to permit the withdrawal of a plea is solely within the discretion of the district

court.") (quoting *United States v. Showalter*, 569 F.3d 1150, 1154 (9th Cir. 2009)).  A defendant may not withdraw his guilty plea "simply on a lark."  *United States v. Hyde*, 520 U.S. 670, 676–77 (1997).  However, the district court must review each case in the context in which the motion to withdraw guilty plea arose to determine whether a fair and just reason exists.  *United States v. McTiernan*, 546 F.3d 1160, 1167 (9th Cir. 2008).

Fair and just reasons for withdrawal include: (1) inadequate Rule 11 plea colloquies, (2) erroneous or inadequate legal advice, (3) newly discovered evidence, (4) intervening circumstances, or (5) any other reason for withdrawing the plea that did not exist when the defendant entered his plea.  *Yamashiro*, 788 F.3d at 1237; *United States v. Jones*, 472 F.3d 1136, 1141 (9th Cir. 2007).  The Ninth Circuit has recognized certain circumstances as important factors in determining whether fair and just reason exists, including the defendant's assertion of legal innocence, the reason the defenses were not put forward at the time of the original pleading, and the amount of time that has passed between the plea and the filing of the motion.  *McTiernan*, 546 F.3d at 1167 (citing Fed. R. Crim. P. 32 advisory committee's note (1983)).  Where there is a fair and just reason to withdraw a plea, the defendant's actual motivation does not prevent his withdrawal of the plea.  *Id.* at 1168 (district court's finding that defendant wanted to withdraw his plea only to avoid a custodial sentence did not bear upon the standard for plea withdrawal).

The district court's denial of a motion to withdraw a guilty plea is reviewed for abuse of discretion.  *Yamashiro*, 788 F.3d at 1236; *McTiernan*, 546 F.3d at 1166.  Under this standard, the Ninth Circuit reviews a district court's findings of fact for clear error.  *Id.*; *United States v. Sherburne*, 249 F.3d 1121, 1125 (9th Cir. 2001) (a district court abuses its discretion when it "rests its determination on a clearly erroneous finding of fact").  The district court does not abuse its discretion in denying a motion to withdraw a plea when a defendant was aware of the grounds for withdrawal prior to entering the guilty plea.  *Mayweather*, 634 F.3d at 506.

**II.    ANALYSIS**

**A.    Adequacy of the Plea Colloquy**

To ensure that a defendant's guilty plea is knowingly, intelligently, and voluntarily made, a district court must advise the defendant of his rights, and confirm the defendant understands his

rights, the nature of the charges against him, and the consequences of pleading guilty.  Fed. R. Crim. P. 11(b)(1); *see also, e.g.*, *United States v. Covian-Sandoval*, 462 F.3d 1090, 1093 (9th Cir. 2006) ("Rule 11 requires a trial judge, before accepting a guilty plea, to engage in a colloquy with the defendant to confirm that the defendant understands, among other things, 'the nature of each charge to which the defendant is pleading'.") (quoting Fed. R. Crim. P. 11(b)(1)(G)).  The court also must assure itself that there is a factual basis for the plea.  Fed. R. Crim. P. 11(b)(3).  The court examines "solely the record of the plea proceeding itself."  *Covian-Sandoval*, 462 F.3d at 1093 (citing *United States v. Kamer*, 781 F.2d 1380, 1383 (9th Cir. 1986)).

When examining whether the factual basis of a plea is sufficient, the Ninth Circuit has limited the inquiry to evaluating whether the record establishes " 'sufficient evidence to support the conclusion that the defendant is guilty'."  *Id.* (quoting *United States v. Rivera-Ramirez*, 715 F.2d 453, 457 (9th Cir. 1983)).  Under Rule 11(b)(3), "a district court does not have to make 'an express finding of a factual basis during the plea colloquy'."  *Id.* (quoting *In re Ellis*, 356 F.3d 1198, 1205 (9th Cir. 2004) (en banc)).  "Sufficient evidence indicating guilt is adequate; the court need not convince itself of guilt beyond a reasonable doubt."  *United States v. King*, 257 F.3d 1013, 1022 (9th Cir. 2001); *Covian-Sandoval*, 462 F.3d at 1093 (factual admission supporting an inference of criminal intent was sufficient evidence to support a defendant's guilty plea).

A district court's detailed colloquy with the defendant is strong evidence that he understood the meaning of his actions.  *United States v. Ross*, 511 F.3d 1233, 1236 (9th Cir. 2008) ("Statements made by a defendant during a guilty plea hearing carry a strong presumption of veracity in subsequent proceedings attacking the plea.").  The district court does not abuse its discretion in denying a motion to withdraw a guilty plea when a defendant's testimony during the plea hearing directly contradicts his contention that he did not enter his plea voluntarily and knowingly.  *Yamashiro*, 788 F.3d at 1237.

Here, the court finds that the plea colloquy demonstrates that Davis' guilty plea was knowingly, intelligently, and voluntarily made.  Before changing his plea, Davis swore to tell the truth under the penalty of perjury.  Change of Plea Tr. (ECF No. 249) at 3.  The district judge advised Davis of his rights, and Davis confirmed that he understood those rights, the nature of the

1   charges against him, and the consequences of pleading guilty.  *Id.* at 4–13, 17–30, 49.  The district

2   judge stated the elements of all three charged offenses and confirmed that Davis understood the

3   government would have to prove each of those elements to convict him of the crimes charged in

4   Counts 1, 2, and 3.  *Id.* at 11–13.  Davis' assertions that he was confused and did not admit to an

5   adequate factual basis for the plea are belied by his own admissions during the course of the district

6   judge's questions.  Statements made during the plea hearing are entitled to a strong presumption

7   of veracity in later attacks on the plea.  *See Ross*, 511 F.3d at 1237.

8       Davis asserts he was blindsided when the district judge asked him for factual admissions.

9   However, Davis admitted he understood that the district judge had to ask Davis questions about

10  what he did to satisfy the judge that he was guilty as charged.  Change of Plea Tr. (ECF No. 249)

11  at 9:16–25.  Davis repeated the question and answered affirmatively.  *Id.*  Davis also held an off-

12  the-record discussion with Oronoz immediately after this question, but he did not ask the district

13  judge any more questions on the subject or change his answer.  *Id.* at 9–10.

14      Davis claims the transcript is unclear as to what facts he agreed were the basis for his plea

15  on Count 3.  However, the transcript shows that the district judge and government counsel

16  repeatedly answered Davis' questions and re-stated evidence until Davis agreed with the fact

17  statements.  At first, government counsel read a summary of the evidence stated in a proposed plea

18  agreement, which included allegations regarding a robbery investigation and the indictment does

19  not charge Davis with robbery.  *Id.* at 31–32.  Davis did not agree with the robbery allegations.  *Id.*

20  at 32.  The parties confirmed that Davis was not pleading guilty to a robbery charge, and Davis

21  then agreed with the remainder of the government's statement of evidence.  *Id.* at 33.

22      When Davis waivered on his acceptance of that statement of evidence, government counsel

23  asked the district judge to canvas Davis, and Davis agreed to answer the district judge's questions

24  about what he did in July 2012 that caused him to plead guilty.  *Id.* at 38–39.  Davis admitted: (1)

25  the police found marijuana and cocaine on his person and in his home, (2) the police found his gun

26  and ammunition in his home, (3) he gave his friends marijuana and cocaine for them all to smoke

27  together, and (4) he had the gun to protect himself and his belongings in the home.  *Id.* at 40–46.

28  *See, e.g.*, *United States v. Hector*, 474 F.3d 1150, 1157 (9th Cir. 2007) (holding that a firearm kept

for home protection and within defendant's "easy reach" gave rise to the "ready inference" that the gun was possessed in furtherance of underlying drug business). These admissions match the elements necessary for the government to convict Davis of Counts 2 and 3. *See, e.g.*, 9th Cir. Model Crim. Jury Instructions 8.65, 8.72, 9.15 (2010 ed.) (last updated Mar. 2016). Despite these admissions, the government wanted Davis to admit more to create a sufficient factual basis. Change of Plea Tr. (ECF No. 249) at 46–47. Thus, government counsel read the allegations of Count 3 directly from the indictment and Davis agreed that those facts were correct. *Id.* at 48–49.

These exchanges and Davis' admissions show a sufficient factual basis for all three Counts in the indictment. Although Davis stated he was confused at times during the plea, the district judge and counsel made multiple efforts to explain the process to Davis and ensure that his admissions were knowing, voluntary, and had a sufficient factual basis. Davis asked the district judge multiple questions and those questions were answered. Davis spoke to Oronoz off-the-record multiple times, and each time Davis continued with the plea colloquy. Additionally, both Oronoz and the district judge told Davis that the trial should proceed if Davis was not clear about the factual admissions necessary for the guilty plea, and Davis chose to continue with the plea. *Id.* at 38–39. Davis' sworn statements before the district judge are given greater weight than his subsequent claim that he did not articulate an adequate factual basis to support his guilty plea. *See Blackledge v. Allison*, 431 U.S. 63, 73–74 (1977); *Ross*, 511 F.3d at 1236; *United States v. Castello*, 724 F.2d 813, 815 (9th Cir. 1984). The court finds that the plea colloquy and Davis' admissions establish sufficient evidence to support the conclusion that Davis is guilty.

### B.    Adequacy of Counsel's Legal Advice

"Erroneous or inadequate legal advice" may constitute a fair and just reason to withdraw a guilty plea. *Yamashiro*, 788 F.3d at 1237 (citing *Bonilla*, 637 F.3d at 983). When the basis for withdrawal is erroneous or inadequate legal advice, a defendant's burden is simply to show that proper advice could have plausibly motivated a reasonable person in the defendant's position not to have pled guilty had he known about such grounds prior to pleading. *Mayweather*, 634 F.3d at 504–05 (quoting *United States v. Garcia*, 401 F.3d 1008, 1011–12 (9th Cir. 2005)). "The defendant need not show that a legal argument foregone as a result of incorrect or incomplete

advice would have been 'successful on its merits'." *Mayweather*, 634 F.3d at 505 (quoting *McTiernan*, 546 F.3d at 1168). In other words, a defendant is not required to show that he would not have pled guilty, but only that the proper legal advice of which he was deprived could have "plausibly motivated a reasonable person in the defendant's position not to have pled guilty." *Yamashiro*, 788 F.3d at 1237 (quoting *Bonilla*, 637 F.3d at 983) (internal citation omitted); *see also Garcia*, 401 F.3d at 1011–12. However, "circumstances known to a defendant at the time of the guilty plea" are not a fair or just reason to withdraw a plea under Rule 11(d)(2)(B). *Mayweather*, 634 F.3d at 506.

Here, the court finds that Davis has not shown a fair or just reason to withdraw his plea based on erroneous or inadequate legal advice because he has not shown deficient legal representation. Davis claims that his confusion was caused by Oronoz's failure to explain the plea process and the consequences of entering a guilty plea without an agreement. However, as explained above, the transcript of the plea colloquy does not support his assertions. His sworn statements to the district judge reveal that he was satisfied with his legal representation, despite their prior disagreements. Change of Plea Tr. (ECF No. 249) at 6–8. Although Davis argues that Oronoz was not prepared for trial, Davis provides no evidence to support that claim. To the contrary, the record shows that Oronoz fully litigated Davis' case by filing multiple suppression motions and motions in limine. Davis was has not shown any gross mischaracterization of a possible sentence or other incorrect or incomplete advice. Rather, the record indicates that Oronoz zealously represented Davis throughout the case and abided by Davis' fervent wish to go to trial.

Furthermore, there is no legitimate factual issue regarding his pre-plea knowledge of the circumstances he now claims as reasons to withdraw his plea. For example, Davis cannot show he lacked awareness of the maximum possible penalties. Davis contends that Oronoz failed to adequately apprise him of the sentence he could receive and he lacked an understanding of the federal sentencing guidelines, the charging statutes, and the effect of the § 851 Notice. However, Davis' May 2016 letter (ECF No. 225) to the district judge demonstrates that his counsel *did* apprise him of the maximum possible sentence if he was convicted on all counts at trial: 360 months (*i.e.*, 30 years) to life in prison. *Id.* Counsel told Davis, "[y]our criminal history combined

1   with convictions for the instant offenses will very likely mean that you will remain incarcerated

2   for the duration of you [*sic*] life." *Id.* Davis adamantly disagreed with his counsel's conclusion

3   and told the district judge that counsel's representation that he was "faceing [*sic*] life is B.S." *Id.*

4   Davis' letter—written weeks before he entered the guilty plea—shows that his counsel informed

5   him of the maximum possible sentence for the charged offenses.

6          Additionally, during the May 27, 2016 hearing on Oronoz's Motion to Withdraw,

7   government counsel told the court that Davis could be sentenced to "30 years to life" if convicted

8   on all charges based on the preliminary PSR indicating that Davis is a career offender. Hr'g Tr.

9   (ECF No. 270) at 4. During hearing before the district court outside of the presence of the jury

10  and government counsel, Oronoz disputed Davis' contention that he had no idea he was facing a

11  possible 360-month sentence. *Ex Parte* Hr'g Tr. (ECF No. 261) at 3. Davis admitted during the

12  evidentiary hearing on the motion to withdraw his plea that he was aware of and reviewed the PSR,

13  which stated his potential sentence, qualification as a career offender, and calculation of his

14  criminal history points. Evid. Hr'g Tr. (ECF No. 278) at 57–60. Davis' disagreement with the

15  government and his counsel's assessment or the calculations stated in the PSR does not undermine

16  his knowledge of the possible life sentence well before June 6, 2016.

17         Davis also contends that he was not fully apprised of the benefits and risks of pleading

18  guilty without a plea agreement because he did not receive a second opinion by a sentencing

19  consultant, which the court approved during the May 27, 2016 hearing. However, the record

20  plainly demonstrates that Davis insisted on going to trial June 6th. Davis' May 2016 letter (ECF

21  No. 225) clearly states that he wanted his trial to go forward on June 6, "I want my trail [*sic*] now."

22  The court found Mr. Oronoz credible that he attempted to retain a consultant but was not able to

23  do so in the short time between when it was authorized on May 27 and the June 6th trial, that he

24  intended to have the consultant review the final PSR before sentencing, and so advised Davis.

25  When Oronoz could not retain a sentencing consultant before June 6, Davis still insisted on moving

26  forward with that trial date. Evid. Hr'g Tr. (ECF No. 278) at 102–03. Davis did not claim he

27  asked Oronoz to move for a continuance based on the inability to obtain the second opinion before

28  trial. The record is clear Davis insisted he wanted to go to trial and wanted no more continuances.

Additionally, Davis asserts that Oronoz failed to adequately explain prior plea offers to him, and that if Oronoz had done so, Davis would not have entered a straight-up guilty plea in the manner that he ultimately did.  This contention is simply not supported by the record.  Davis' May 2016 letter to Judge Mahan (ECF No. 225) expressly stated that "any chances of a deal is now not up for consideration."  Counsel's letter to Davis, which Davis attached and asked to be made part of the record, indicates that they had spoken to Davis "on numerous occasions about the plea negotiations."  *Id*.

During the May 27, 2016 hearing, the government recapped various plea offers that Davis had rejected as "too extreme."  Hr'g Tr. (ECF No. 270) at 4–5.  Davis did not tell the court he had no knowledge of the plea offers; rather, he stated his disagreement with the PSR's calculations and Oronoz's advice.  *See id.*  After the trial started, Oronoz and government counsel made a record of two recent plea offers that Davis had rejected.  Day 1 Jury Selection Tr. (ECF No. 260) 83–85. When the proceeding resumed after lunch, outside of the presence of the jury, government counsel reported to the court in the presence of Davis and his counsel that another offer was extended to Davis over the lunch hour, but Davis rejected that offer and decided to plead guilty without an agreement.  Change of Plea Tr. (ECF No. 249) at 2–3.  Davis did not tell the district judge he was unaware of the three plea offers or did not understand their terms.  Rather, he discussed the terms with his counsel, made counteroffers, and ultimately decided to enter a straight-up guilty plea to preserve his appellate rights on his pretrial motions.  Thus, the record indicates Davis was aware of the plea offers before he pleaded guilty but rejected them to retain his appellate rights.

Neither Davis nor Oronoz expected the § 851 Notice.  Davis and his counsel first learned of the § 851 Notice the morning of June 6 before the trial began.  However, his lack of appreciable pre-plea knowledge does not demonstrate erroneous or inadequate legal advice because the only practical effect of the § 851 Notice was an increase of the statutory maximum for the drug offense from 20 to 30 years, and Davis already knew a life sentence was possible.  Davis testified that he was blindsided and confused by the § 851 Notice because it was not filed until the morning of trial. Evid. Hr'g Tr. (ECF No. 278) at 12–14.  He claims he did not understand the effect the Notice would have on his maximum possible sentence because Oronoz told him not to worry since they

42

would be challenging everything on appeal. *Id*. Oronoz testified that Davis may have experienced some confusion about the § 851 Notice because it was "sprung" on them the morning of trial. *Id*. at 87–88. However, Oronoz confirmed that they always knew a life sentence was possible in this case, *id*., and he explained the effect of the § 851 Notice to Davis before his change of plea. *Id*. at 96–97. Davis seemed to process the information despite not liking the development. *Id*.

The transcript of the plea colloquy supports Oronoz's testimony. Davis expressed confusion regarding the § 851 Notice when government counsel and the district judge stated that the Notice increased the statutory maximum penalties. Change of Plea Tr. (ECF No. 249) at 13–16. But government counsel and the district judge explained the function of the Notice and Davis seemed to be satisfied with their answers:

> THE DEFENDANT: Is it giving notice to the courts that they intend to or --
> THE COURT: Well, this is what they are going to argue. They have given notice that this is what they are going to argue.
> THE DEFENDANT: Oh, okay.
> MR. ORONOZ: Right.
> THE COURT: All right? Do you agree, Mr. Smith?
> MR. SMITH: Yes, sir. …

*Id*. at 16:15–24. Other than arguing that he did not anticipate the § 851 Notice prior to trial, Davis fails to show, or even argue, how this amounted to deficient legal representation. Davis was clearly advised orally and in writing that a life sentence was possible in this case because the statutory maximum penalty for a violation of 18 U.S.C. § 924(c) is life. Davis has failed to show inadequate legal advice to support a fair and just reason to withdraw his guilty plea.

## **CONCLUSION**

In sum, having carefully reviewed and considered the transcript of the change of plea hearing, and the record exhaustively outlined in this Report and Recommendation, the court concludes that Davis guilty plea was knowingly, voluntarily, and intelligently made. Davis has not met his burden of showing a fair and just reason for withdrawing his plea.

/ / /

/ / /

/ / /

43

For the reasons explained,

**IT IS RECOMMENDED** that Defendant Tyrone Davis' Motions to Withdraw Guilty Plea (ECF Nos. 255, 264) and the government's Motion to Strike (ECF No. 256) be **DENIED.**

Dated this 10th day of November, 2016.


PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE